# UNION NAT. BANK, OF COLUMBUS, OHIO, v. MAIL-LOUX et al.

One fraudulently induced to enter into a contract may repudiate
the contract and tender back what he has received under it and re-
cover what he has parted with, or its value, or he may affirm the
contract and recover the damages caused by the fraud, or he may
avail himself of the fraud, either in total bar of an action against
him on the contract or by way of reduction of damages.

An agent of the seller of a horse induced buyers to buy 15
shares out of a total of 18 in the horse, by fraudulently represent-
ing that the three shares would be taken by third persons financially
responsible, and who, with the buyers, would sign the note for the
price. The buyers signed the note, but the third persons did not
do so, and the agent, who was financially irresponsible, signed as
purchaser of the three shares. The buyers paid their respective
shares of the note. **Held,** that the buyers were not responsible for
the three shares to the seller or one not a bona fide purchaser of the
note.

Where the payee of a note obtained it through a fraud on the
maker, an indorsee suing the maker must show the facts making
him an indorsee in due course.

Where the cashier of a bank testified that the bank purchased
a note, procured from the maker by the fraud of the payee, with-
out notice and paid a fair consideration for it, and that he acted in
good faith, the jury, in an action by the bank against the maker,

defending on the ground of fraud, could consider the circumstances connected with the purchase of the note by the bank and determine whether it purchased the same in good faith.

A purchaser of a negotiable instrument must show, to constitute himself a purchaser in good faith, that he used the means that an ordinarily prudent man would use to ascertain the manner in which the note was obtained from the maker, and he may not refrain from making inquiries, where he has knowledge of facts which excite in his mind such suspicions as to the paper that he fears to make an investigation, lest it will disclose a defense, and he has the burden of showing that he used the ordinary means to ascertain the validity of the note in his hands as indorsee.

That a note was not offered for sale to the indorsee thereof until shortly before its maturity and nearly three years after its date is a circumstance sufficient to put him on inquiry as to the reasons for the delay, and calls on him to make such inquiry, before he can claim to hold the note as a bona fide purchaser.

That an indorsee of a note had not made a demand on the payee for payment is a suspicious circumstance, on the issue whether the indorsee is a bona fide purchaser; the makers being nonresidents, as to whose financial condition the indorsee had made no inquiry.

A bank discounting a note before maturity and merely crediting the payee with the proceeds thereof is not a purchaser for value, but to become such a purchaser it must show that the amount credited to the payee was withdrawn by him prior to the bank receiving any notice of facts invalidating the note.

In an action on a note by an indorsee, evidence **held** to justify a finding that the indorsee was not a bona fide purchaser.

(Opinion filed June 21, 1911.)

Appeal from Circuit Court, Meade County. Hon. JOSEPH W. JONES, Judge.

Action by the Union National Bank of Columbus, Ohio, against Louis Mailloux and others. From a judgment for defendants and from an order denying a new trial, plaintiff appeals. Affirmed.

Harry P. Atwater, for appellant. Eben W. Martin and Norman T. Mason, for respondents.

CORSON, J. This is an appeal by the plaintiff from a judgment entered in favor of the defendants and from the order denying a new trial. The action was instituted by the plaintiff to recover a balance upon two promissory notes claimed to be due the plaintiff as indorsee. The complaint is in the usual form. All of

the defendants were served and answered in the case, excepting H. E. Eldridge, who is a nonresident of the state. Each note was for $1,200, and was signed by the answering defendants, one of the notes bearing date of July 1, 1904, payable July 1, 1908 (1906) after date, and the second note made payable July 1, 1907. The notes in form were joint and several.

Plaintiff demanded judgment against the defendants and each of them for the amount of $233.19, with interest from July 5, 1906, at 6 per cent. per annum, and for the further sum of $178.80, with interest thereon from July 5, 1907, at 6 per cent. per annum. All the defendants answered jointly, excepting the defendant Eldridge, and after making certain admissions as to the incorporation of the plaintiff, and the execution of the notes, admit that they signed the notes set forth in the complaint, but allege that the same were delivered to the payees without their knowledge or consent, and contrary to their express instructions and agreement; deny any knowledge or information sufficient to form a belief as to whether the payee thereof, before maturity or otherwise, assigned or delivered the said notes to plaintiff for a valuable consideration or otherwise, and as to whether the plaintiff is now the owner or holder thereof; admit that at maturity said notes were presented for payment and payment thereof demanded, and allege that each of these defendants paid his proportion of said notes, both principal and interest, promptly when the same became due, but that the defendant, H. E. Eldridge failed and neglected to pay any part of his proportion thereof, and that the balance alleged to be due on said notes is the proportion thereof which, under the agreement between the signers thereof, at the time of its execution, should have been paid by the said H. E. Eldridge; deny any knowledge or information sufficient to form a belief as to the allegations contained in the fifth and sixth paragraphs of the complaint, which set out the amount due for protest fees and the balance due on the notes; and, for a further defense and by way of counterclaim, it is alleged upon information and belief that the plaintiff is a corporation organized under the laws of the United States; that the notes set out in the com-

plaint were two of three notes of the same amount and purport, executed for the purchase price of a stallion, sold by McLaughlin Bros., the payees in the said notes, to these defendants through their codefendant, H. E. Eldridge, who made the said sale. as the agent of the McLaughlin Bros.; that it was agreed between the defendants and the said agent of McLaughlin Bros. that each of these defendants should own a certain interest in the said stallion, and should be liable for a corresponding portion of the purchase money thereof; that the said notes were signed by the first seven of the makers thereof.

On the trial, the defendants were permitted to amend their answer by adding thereto the following: For further defense, also by way of counterclaim, to each of the plaintiff's causes of action, these defendants allege that the notes set out in the complaint were two of three notes for the same amount, purported to be executed for the purchase price of a stallion sold by McLaughlin Bros., the payees in the said notes, to these defendants through their codefendant, H. E. Eldridge, who made the said sale as the agent of the said McLaughlin Bros. That it was agreed between the defendants and said agent of McLaughlin Bros. that each of these defendants should own a certain interest in the said stallion aggregating fifteen-eighteenths, and should be liable for a corresponding portion of the purchase money thereof. That in order to obtain the signature of the answering defendants to said notes the said McLaughlin Bros.' agent represented and stated to these defendants that he had an agreement from one Alexander Cruickshank and Harry Bunting to purchase the remaining three-eighteenths interest in said horse, and to sign each of said notes with the answering defendants. The said agent also stated and reperesented that he would and could obtain the signatures of said two parties to said notes. That said statements were material; were believed by these defendants, and that, except for said statements, these defendants would not have signed said notes. That relying thereon these defendants did sign the notes. That said statements were false and untrue and were known by the said agent to be false and untrue. That said agent also stated to one of the defendants, Theodore Karrels, before he

signed the said notes, that the same should not be delivered until the parties purchasing the remaining three shares in said horse should sign the same, and that. said delivery should not be made without the knowledge of the first seven signers, nor without the approval and acceptance of the signers for the remaining three shares of said horse. · That, contrary to said agreement, and without the knowledge or consent of these defendants, the said H. E. Eldridge himself signed the notes for the remaining three shares, and without the knowledge or consent of these defendants, contrary to their agreement and without their acceptance of the said Eldridge as cosigner with them all, the said Eldridge undertook to deliver the said notes to his principals, McLaughlin Bros.  That said Eldridge was at that time and has ever since been and is insolvent, and has failed and neglected to pay any portion of said notes to these defendants, damaged in the amount of the balance due thereon.  Therefore defendants pray for damages and their costs.

Evidence was admitted on the part of the defendants tending to prove the allegations of the answer, and it was stipulated that the defendant Eldridge is not and was not at the time of his signature financially responsible, but subject to objection on the ground of its immateriality or irrelevancy.  At the close of the evidence, plaintiff moved the court to strike from the record all of the evidence of the defendants relating to the negotiations in the matter of taking the notes, and all of the statements of Eldridge as to what he would do, and his promises, for the reason that all such evidence taken together, if true, is immaterial and constitutes no defense.  Plaintiff also moved the court to direct a verdict on the ground that the uncontradicted evidence shows that the plaintiff purchased these notes, before maturity, for value, in the usual course of business and without notice, either actual or constructive, of any existing or claimed defense thereto; and for the further reason that the uncontradicted evidence on the part of the defense, even if true, constitutes neither a counterclaim nor a defense.

The jury having returned a verdict in favor of the defendants, motion for a new trial was made and denied.  It is contended by

the appellant that the court erred in denying plaintiff's motion to strike out the evidence of the defendants, for the reason that there is a total lack of evidence disclosing any damage or injury resulting from the alleged promises and statements of the said Eldridge, and for the further reason that the defendants, by failure to rescind or attempt to rescind the contract and return or offer to return the consideration for said contract, had waived any damage or injury that may have resulted from the said acts on the part of said Eldridge, if any resulted therefrom.

It is further contended that the evidence does not support the verdict, for the reason that the evidence is not sufficient to justify or support a verdict for the defendants, and was not sufficient to constitute a defense to the notes, in that it related, neither to the failure of consideration nor a failure to execute the notes, nor to the nondelivery of the notes, but shows affirmatively that, if true, it has been waived by the defendants, by their failure to rescind the contract and restore to the payees or indorsee of the notes the consideration received therefor; and that the defendants have recognized the validity of the notes by making payments thereon, after becoming aware of the alleged fraud, as it appears from the evidence that the horse purchased has been and is now retained by the defendants; that they have had the use of the same and the proceeds from its use and all profits arising from the same.

The respondents, on the other hand, contend that there are two questions involved. They concede that they have not pleaded, and cannot attempt to plead, under the facts, a rescission of the entire contract of sale, or of the notes executed by them. They concede that the facts alleged by them do not constitute a defense to the whole of the notes sued on, for the reason that such facts go only to a part of the consideration thereof; they do not, and are not intended, to operate as a complete defense to the collection of every part of the purchase money represented by these notes. But they insist that the facts as set forth in both the original and amended answers as a further defense, and also by way of counterclaim, constitute a defense to this action.

The first question, therefore, is, Have the defendants a valid counterclaim or defense against the McLaughlin Bros.? And the

second question is, Was there sufficient evidence to require the court to submit to the jury the question of its good-faith purchase by the plaintiff?

It will be noticed that the defendants allege in the defense and counterclaim, and that evidence was submitted in support of the allegations, that they agreed to purchase but 15 shares out of the total 18 shares in the stallion for which these notes were given; that the remaining three shares have never been claimed by them; that the McLaughlin Bros.' agent falsely represented that these three shares had been purchased by Cruickshank and Bunting, and that he could, and would, secure the signature of these two parties to the notes; that, notwithstanding this representation, he himself signed the notes for the three shares which he said had been purchased by Cruickshank and Bunting; that the latter parties were financially responsible and known by the answering defendants to be such; that McLaughlin Bros.' agent was financially irresponsible; that this action is brought for part of these notes which represented the price of the three shares which were not purchased by the answering defendants. Had Cruickshank and Bunting, instead of McLaughlin Bros.' agent purchased these three shares and signed the notes therefor, the balance now sued for would have been paid by Cruickshank and Bunting, or payment therefor could have been enforced against them; that such payment cannot be enforced against McLaughlin Bros.' agent.

The result of the situation, therefore, is that McLaughlin Bros., through their agent, are the owners of the three shares in this stallion which the answering defendants supposed had been purchased by Cruickshank and Bunting; and McLaughlin Bros.' indorsee is now suing, in effect, these defendants for the value of these three shares. If this suit is maintained, these defendants will be compelled to pay McLaughlin Bros.' indorsee for three shares in the horse which they never agreed to purchase, and which are in fact, if they have not been sold, owned by the Mc-Laughlin Bros. or their agent, Eldridge.

It is contended by the respondents that the value of these three shares Cruickshank and Bunting would have been compelled

to pay, if the representations of McLaughlin Bros.' agent had been true, because they would have paid, or been compellable to pay, the balance on these notes.

In the evidence of Theodore Karrels, he testified: "I told him (Eldridge) I did not want to have anything to do with it that way, because some people would be on the note not responsible, and we would have to help pay their. He said he would agree, and did agree, to sell a share to no one, unless he asked those who had agreed to take shares in the horse first. * * * He told me Cruickshank would sign. * * * He said he agreed to take them shares, and he would get them to sign the notes, and that Bunting was out of town, and he said he would sign the notes as quick as he got back. * * * Cruickshank and Bunting were responsible."

[1] The question therefore is fairly presented, Could these damages be recovered of McLaughlin Bros. by action if the plaintiff recovers in this action? If so, then they could be recovered by way of counterclaim.

The law upon this subject is thus stated in 14 Am. & Eng. Ency. of Law, 167, 169: "It has sometimes been contended that when a party has been induced to enter into a contract by the fraud of the other party his only remedy is to rescind the contract, and sue to recover what he has parted with, or set up the fraud as a defense, if he is himself sued on the contract. It is thoroughly well settled, however, that he has an election of remedies, and that, while he may rescind, he is not bound to do so, but may hold the other party to the contract, and sue him to recover the damages which he has sustained in consequence of the fraud. It necessarily follows from this that when a person who has been drawn into a purchase or other contract by fraud does not seek to rescind the same, but merely seeks to recover the damages sustained by reason of the fraud, he is not required to return or offer to return what he has received under the contract. He may retain the same and recover his damages. * * * When the fraud for which it is sought to recover damages is connected with a contract as an inducement, the party injured, instead of taking the initiative and bringing an action of deceit, may in most jurisdic-

tions wait until the other party sues him on the contract, and then recover his damages by way of recoupment or counterclaim. Thus, in most jurisdictions, in an action against the purchaser of property to recover the price, or on a note given for the price, he may recover by way of recoupment or counterclaim the damages sustained by reason of the seller's false and fraudulent representations with respect to the property."

And in 20 Cyc. 87 the rule is stated as follows: "A person who has been fraudulently induced to enter into a contract has the choice of several remedies. He may repudiate the contract and, tendering back what he has received under it, may recover what he has parted with, or its value; or he may affirm the contract, keeping whatever property or advantage he has derived under it, and may recover in an action of deceit the damages caused by the fraud. While his affirmance may preclude him from rescinding the contract, it does not prevent his maintaining an action of deceit. Moreover, if sued upon the contract, he may set up the fraud as a defense, or as a basis of a claim for damages by way of recoupment or counterclaim."

And Mechem, in his work on Agency, § 744, states the law as follows: "The party injured by the agent's fraud, if he desires to take the initiative, has ordinarily his choice of three remedies: (a) He may promptly restore what he has received under the contract, rescind the contract, and recover what he has parted with in pursuance of it; or (b) he may retain what he has received, and bring his action for the fraud practiced upon him; or (c) he may retain what he has received and, waiving the fraud, bring his action, based upon the contract, for damages sustained by reason of its breach. If, on the other hand, he prefers to act upon the defensive, he may avail himself of the fraud, either in total bar of an action brought against him by the principal or by way of the reduction of damages."

The foregoing quotations seem to be supported by the great weight of authority. It is contended by the appellant that the decision of the Iowa National Bank v. Sherman, 23 S. D. 8, 119 N. W. 1010, is opposed to the law as before quoted, but in that

case there was no plea of partial defense or counterclaim, but the defendants attempted to defeat plaintiff's entire cause of action, which was set up by way of defense only, but, inasmuch as they had received some consideration for their contract, but had not rescinded the contract itself, it was not wholly invalid or void. This court was very careful in its opinion to say: "There is no attempt to plead damages from breach of warranty as a counterclaim, and there is no claim upon appeal, nor does it appear anywhere in the record that the question of counterclaim was considered."

[2] In the case at bar, however, defendants' damages are set up by way of counterclaim or partial defense to the action. It is not claimed that they are sufficient to offset or defeat the whole of the note sued on. It is alleged in the answer that the defendants were damaged in the amount of the balance due on the notes; that is, the balance so due being the purchase price represented by the three shares which defendants did not buy and which Eldridge represented had been bought by Cruickshank and Bunting. As to these three shares, defendants do not claim and have not claimed that they are the owners. Consequently the defendants have never accepted these three shares and are not bound therefor, assuming, of course, that the plaintiff is not a bona fide purchaser of the notes in suit.

[3] It will be noticed that it is contended by the plaintiff that the court should have directed a verdict in favor of the plaintiff, for the reason that its evidence as to the bona fides of the plaintiff in the purchase of the notes is uncontradicted; but, for the purposes of the motion, the evidence of the defendants as to the manner in which the notes were obtained by the agent of McLaughlin Bros. tending to prove that they were fraudulently obtained, the burden was cast upon the plaintiff to show all the facts constituting it an indorsee in due course.

In the case of Landauer v. Sioux Falls Imp. Co., 10 S. D. 205, 72 N. W. 467, in which there was evidence tending to prove that the possession of the note sued on was fraudulently obtained from the defendants, and that the same was never in fact deliv-

ered by them, this court says: "The presumption arising from the mere fact of possession (of the note) is overcome by evidence that the instrument was unlawfully put in circulation, and the burden was upon plaintiff to show all 'the facts constituting an indorsee in due course." Mee v. Carlson, 22 S. D. 365, 117 N. W. 1033, 29 L. R. A. 351; Rochford v. Barrett, 22 S. D. 83, 115 N. W. 522. In the case at bar this burden was sought to be sustained solely by the evidence of the plaintiff's cashier.

In McGill v. Young et al., 16 S. D. 360, 92 N. W. 1066, this court held, as appears by the headnote, that : "Where ,in an action on a note by an indorsee, fraud in the execution of the note, pleaded as a defense, was clearly established, the fact that plaintiff's evidence was not directly contradicted did not require the direction of a verdict for plaintiff; the jury being warranted, from facts and circumstances disclosed by plaintiff, in inferring that he was connected with the payee in the perpetration of the fraud." And in its opinion, the court says: "At the close of all the evidence, the plaintiff moved the court to direct a verdict in his behalf on the ground that it was shown by the uncontradicted evidence that the plaintiff was the purchaser of the note in good faith, for value, and without notice of the defense set up in this action. The motion was denied, and we think correctly. It is true that the evidence of the plaintiff was not directly contradicted, but there were circumstances disclosed by it from which the jury might have drawn the inference that he was connected with Collins in the perpetration of the fraud, or had sufficient notice of the fraud to stop him from claiming to be a bona fide purchaser for value. The fraud in the giving of the note being established, the burden was upon the plaintiff to prove that he was a purchaser in good faith, for value, and without notice of the fraudulent character of the transaction." And the court, after citing authorities, proceeds: "Not only was it proper to submit to the jury the questions of fact arising from the evidence, but also the credibility of the witness. The plaintiff was the only witness in his own behalf, and, being interested in the result of the action, the jury had a right, in view of such interest and the manner in which he gave his

evidence, to disregard the same, as not entitled to credit." And the court in its opinion discusses the cases of Joy v. Diefen lorf, 130 N. Y. 6, 28 N. E. 602, 27 Am. St. Rep. 484; Vosburgh v. Diefendorf, 119 N. Y. 357, 23 N. E. 801.

And in Bank v. Diefendorf, 123 N. Y. 191, 25 N. E. 402, 10 L. R. A. 676, the learned Court of Appeals of New York, in discussing a similar question, in its opinion says: "The burden of proof to establish this fact, as we shall hereafter see, rested upon the plaintiff; and, upon all the evidence, the question, we think, was for the jury to determine. The claim that the plaintiff's cashier was a disinterested witness, whose testimony must be regarded as controlling, if not contradicted, cannot be sustained. Aside from the alleged improbability of his statements, he was the financial agent of the plaintiff, and the owner of one-fifth of its capital stock, and, aside from his direct interest, responsible to his principal for the care, fidelity ,and prudence with which he discharged his official duties. His interest in the transaction was coextensive with that of the plaintiff, and brings him directly within the cases which hold that the credibility of such a witness is a question for the jury to determine. Elwood v. W. U. Tel. Co., 45 N. Y. 549; Honegger v. Wettstein, 94 N. Y. 252. Such evidence is also for the jury, where the evidence of the witness shows his conduct to have been unusual, imprudent, and inconsistent with the character which he seeks to maintain as a bona fide holder. Stilwell v. Carpenter, 2 Abb. N. C. 239; Moody v. Pell, 2 Abb. N. C. 275; Kavanaugh v. Wilson, 70 N. Y. 177. At the close of the evidence, the plaintiff requested the court to direct a verdict for it upon the ground 'that upon the undisputed evidence in the case plaintiff purchased the notes before maturity, paid value therefor, and without notice of any facts constituting a defense to the notes.' This request was denied, and the plaintiff excepted. The trial court submitted the case to the jury under instruction that, if they found the notes were procured from Diefendorf by fraud, and under such circumstances as would not entitle the payee thereof to recover against him, they should consider the further question whether the plaintiff purchased said notes for value and in good faith, and if it did not

that the defendant was entitled to a verdict. * * * The plaintiff claims that the proof showing it purchased the notes before maturity, paying value therefor, conclusively establishes its character as a bona fide holder, and entitles it to recover, in the absence of proof showing that it had notice or knowledge of facts constituting a defense to the action. The plaintiff's contention elminates the element of good faith from the transaction, and assumes that the language, 'a holder for value,' as used in the authorities, is satisfied by proof that the notes were purchased before maturity, and value paid therefor. We think this contention is contrary to the weight of authority in this state, even if it is not wholly unsupported by it. The payment of value for negotiable paper is a circumstance to be taken into account, with other facts, in determining the question of the bona fides of the transaction, and, when full value is paid, is entitled to great weight; but that fact is never conclusive, execpt in the absence of evidence tending to show notice or bad faith. Those who seek to secure the advantages which the commercial law confers upon the holders of bank bills and negotiable paper must bring themselves within the conditions which that law prescribes to establish the character of a bona fide holder. They are entitled to the benefits of that rule only when they have purchased such paper in good faith, in the usual course of business, before maturity, for full value and without notice of any facts affecting the validity of the paper. This has been the law in this state since the case of Bay v. Coddington, 5 Johns. Ch. 54, 1 N. Y. Ch. (L. Ed.) 1006 [9 Am. Dec. 268]; [Id] 20 Johns. 637. The fact that they took the paper before maturity, and paid the full value thereof, in the absence of other facts, undoubtedly affords a presumption of the good faith of the transaction; but where it further appears that such property has been fraudulently or illegally obtained from its owner or maker, and under such circumstances that the person putting it in circulation could not maintain an action thereon, it is incumbent upon the holder, in order to succeed, to go further and show the circumstances under which it came into his possession, and that he has acted in good faith in the transaction. * * * A sufficient number of authorities have been cited to show the uniformity

with which the cases in the highest court of the state hold that upon proof by the defendant that his obligations have been fraudulently or illegally obtained, and put in circulation, the person seeking to recover upon them must show, not only that he bought before maturity and paid value, but also the circumstances under which he acquired the paper, with the view of enabling the jury to determine whether he acted in good faith or not. * * * The burden of making out good faith is always upon the party asserting his title as a bona fide holder in a case where the proof shows that the paper has been fraudulently, feloniously, or illegally obtained from its maker or owner. Such a party makes out his title by presumptions, until it is impeached by evidence showing the paper had a fraudulent inception; and when this is done the plaintiff can no longer rest upon the presumptions, but must show affirmatively his good faith. The question of law involved in this case was considered in the case of Vosburgh v. Diefendorf, 119 N. Y. 360 [23 N. E. 801, 16 Am. St. Rep. 836], and there received the unanimous approval of the court. That case involved questions relating to a note procured in a manner similar to those now under discussion, and we might well have rested our decision upon that case, if there had not been some slight difference in the facts and the manner of their presentation, which have been urged upon us in this appeal. The order of the General Term should be reversed, and the judgment entered upon the verdict affirmed, with costs. All concur."

[4] It will be observed, therefore, in the case at bar that, under the decisions of this court following the decisions of the Court of Appeals of New York, the question as to whether or not the plaintiff was a purchaser of the notes in question, in good faith, was one for the jury, and that the jury, notwithstanding the declaration of the cashier of the plaintiff bank that he purchased without notice, paid a fair consideration for the notes, and that he acted in good faith, still the jury had the right to consider all the circumstances connected with the transaction and determine for itself whether or not the plaintiff did purchase the paper in good faith, and their verdict upon that question, in view of all the cir-

cumstances of the case, under the instruction of the court to which no exception was taken, will not be reversed by this court.

It appears from the evidence of plaintiff that at the time he purchased the second note, March, 1907, he knew that the note due July 1, 1906, had been protested for non-payment, as the notice of protest bears date of July 5, 1906, several months prior to the purchase of the second note. And it further appears that the plaintiff had received a letter from the Meade County Bank, dated July 5, 1906, expressly stating why defendants had refused to pay the balance of this first note. The cashier therefore had full knowledge, both by the notice of protest and by the letter, that the answering defendants were contending that they were not liable upon that note. The letter from the Sturgis bank also contradicts the following portion of the evidence of plaintiff's witness: "Q. Had not payment of the note, Exhibit A, been refused by the makers sued in this action, and the reasons for non-payment by them made known to you and your bank before your purchase of the second note, marked 'Exhibit C'?  A. I cannot say it had been refused; it had not been made at that time, but, so far as I know, there had been no reason given ,except that the bank returned the note, judging from their reply."

In the letter of the cashier of the Meade County Bank of Sturgis, to the cashier of the Union National Bank of Columbus, Ohio, bearing date of July 5, 1906, the cashier writes, among other things: "This note was given for a part of the purchase price of a stallion sold by McLaughlin Brothers, * * * and all the other makers claim that H. E. Eldridge, who is one of the makers of the note and who was at the time of the sale, agent for McLaughlin Brothers, is liable for $200 of this note and the interest on the $200. Being unable to collect this two hundred, we have had the note protested." Clearly, therefore, the cashier must have known when he purchased the second note that the answering defendants claimed they had a defense thereto, as that was one of the series of notes given for the purchase of the stallion, and they had previously purchased the first note which had been protested, and, as we have seen, the reason given by the cashier for

the failure of the answering defendants to pay the full amount.

It further appears from the record that a part of the interest due on the first note on January 1, 1905, had not been paid. The cashier further testified: "We made no inquiry in reference to them (the notes) and did not know any of the parties on either side of the notes, nor did I make inquiry about them." Again: "I made no inquiry of McLaughlin Bros. at any time relative to the makers of the notes that were discounted." The witness further stated: "In case a note is not paid, our rule is to request the indorser to take it up. * * * I did not ask McLaughlin Bros. to take these notes up when they were not paid. I had in former cases, and I knew they would not, unless they were sued on." The witness further testified: "As a matter of course, if I had known of any such controversy, I should not have purchased the notes. I did not take any pains to find out. I did not care whether there was or not. I thought that by taking the notes, without making any inquiry or receiving any information, that the notes would become good in our hands * * * I knew that if our bank was an innocent holder that we would be in better position to collect them than McLaughlin Bros. It would be a general proposition that is always true." Again he says in his deposition: "That may have been one of the reasons why McLaughlin Bros. wanted us to pursue the makers, instead of them." Again he says: "I also knew there had been more or less litigation in connection with their (McLaughlin Bros.') notes.

[5] In Mee v. Carlson, supra, this court says: "The purchaser of a negotiable note, as we have seen, cannot rely alone upon the fact that he has no information of any defense to the same in order to constitute him a purchaser in good faith, but he must go further, and show that he used the means that an ordinarily prudent man would use to ascertain the manner in which the note was obtained from the makers. He is not permitted to refrain from making inquiries, but the burden is upon him to show that he has used the ordinary means to ascertain whether or not the note is a valid note in the hands of the vendor."

And the learned Supreme Court of North Dakota held, in the case of Knowlton v. Schultz, 6 N. D. 417, 71 N. W. 550, as

follows: "He (the purchaser) may, when he bought, have had knowledge of facts which excited in his mind such suspicions as to the paper that he feared to make an investigation, lest it would disclose a defense, and therefore he carefully shut his eyes and bought in the dark. In such a case he would not be a purchaser in good faith." Walters v. Rock, 18 N. D. 45, 115 N. W. 511.

[6] There is another view that throws suspicion upon the good faith of the plaintiff upon the purchase of these notes. The time these notes were offered for sale to the plaintiff by McLaughlin Bros. was such as to excite suspicion. Each of these notes was dated July 1, 1904, and bore interest from January 1, 1905. The first became due on July 1, 1906. This note was purchased by plaintiff on May 8, 1906, less than two months before maturity and nearly two years after execution. The second note matured July 1, 1907, and was purchased by plaintiff on March 22, 1907, nearly three years after its execution, but only a little more than three months before it matured. The fact that these notes were not offered to the bank for sale until so near the time of their maturity was a circumstance that would reasonably arouse the suspicion of the bank, and was sufficient to put it upon inquiry as to the reasons for this delay.

In the analgous case of Rochford v. Barrett, 22 S. D. 83, 115 N. W. 522, this court called attention to section 2452, Civil Code, which reads as follows: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself." Certainly this fact was sufficient to put a prudent man upon inquiry as to the reasons that induced the payees to so long delay the offer of said notes for discount, and called upon the plaintiff to make such inquiry, in the case at bar.

[7] Again the cashier admitted in his evidence that the bank had not made demand upon McLaughlin Bros: or asked them to pay these notes. This of itself is a suspicious circumstance. If these notes were bought bona fide as an investment, is it at all probable that plaintiff would commence suit thereon in another

state against makers whom it did not know, and as to whose financial standing it had made no inquiry, and incur the expense of such a suit? If investment were its sole purpose, would it not immediately have made demand upon McLaughlin Bros. for payment upon their indorsement, and required them to pay the costs of the protest?

[8] It does not appear from the evidence of the cashier that the bank actually paid McLaughlin Bros. the amount of the value of the notes, but that they were simply credited with that amount,. less the discount. If the bank merely credited McLaughlin Bros. with the proceeds of these notes, it is not a purchaser for value. It was bound to go further, and to show that the amounts so credited had been withdrawn by McLaughin Bros. from the bank prior to its receiving any notice of defense. This it did not do; consequently, so far as its evidence goes, it has affirmatively shown iteslf not to be a purchaser for value.

In 4 Am. & Eng. Ency. of Law, 298, the law is thus stated: "Where a bank discounts paper for a depositor who is not in its debt, and gives him credit upon its books for the proceeds of such paper, it is not a bona fide holder for value, so as to be protected against infirmities in the paper, unless, in addition to the mere fact of crediting the depositor with the proceeds of the paper, some other and valuable consideration passes. Such a transaction simply creates the relation of debtor and creditor between the bank and the depositor; and, so long as that relation continues and the deposit is not drawn out, the bank is held subject to the equities of prior parties, even though the paper has been taken before maturity and without notice."

And in the case of the Union National Bank of Columbus v. Windsor et al., 101 Minn. 470, 112 N. W. 999, the learned Supreme Court of Minnesota held, as appears by the syllabus, as follows: "A bank, by purchasing or discounting a note for a depositor and giving him credit for the proceeds on his deposit account, does not, so long as no part of the deposit is drawn out or the balance of the account exceeds the amount of the proceeds of the discount, become a bona fide purchaser of the note for value, so as to be protected against infirmities in the paper."

It affirmatively appears from the evidence of the cashier that the amount paid for these notes was credited to McLaughlin Bros., less the discount, but it is not shown that the amount so paid and credited was ever drawn out by McLaughlin Bros., or that the account of McLaughlin Bros. was reduced below the amount so credited as consideration for these notes. Under the law, therefore, as before quoted from 4 Am. & Eng. Ency. of Law, and under the decision of the Union National Bank of Columbus v. Windsor et al., supra, the plaintiff cannot be held to be a purchaser in good faith, so as to protect the bank against any infirmities in the notes.

[9] The defense in this action being fully sustained by the evidence, and the jury being warranted in finding under the evidence that the plaintiff was not a bona fide purchaser in good faith, this court would not be justified in reversing the verdict of the jury.

We are of the opinion, therefore, that the court was clearly right in denying plaintiff's motion to strike out the evidence of the answering defendants, and in not directing a verdict in favor of the plaitiff, and that the verdict of the jury in favor of the defendants is fully sustained by the evidence.

Finding no error in the record, the judgment of the court below and order denying a new trial are affirmed.