JERKE, Appellant, v. DELMONT STATE BANK, Respondent.

(216 N. W. 362.)

(File No. 5440.    Opinion filed November 30, 1927.)

1. **Bills and Notes—Holder of Note Tainted with Fraud Had Burden of Proving Itself Holder in Due Course (Rev. Code 1919, § 1763).**

     Where one who had obtained a loan through agency of a bank brought suit to recover the proceeds thereof, part of which the bank had retained to pay prior notes owing by the borrower which were held by the bank, held, upon showing that such notes possessed by the bank were tainted with fraud in their inception, bank had the burden of proving itself a holder in due course as provided by Rev. Code 1919, § 1763.

2. **Bills and Notes—Note Purchaser, Having Notice of Facts Indicating Fraud, but Making No Inquiry, Is Not "Holder in Due Course."**

     One who purchases a note before maturity with notice of facts indicating fraud in the inception of the note, who makes no inquiry thereon, is not a "holder of the note in due course."

3. **Bills and Notes—One Purchasing Note from Holder Having Defective Title Must Show Note Was Acquired for Value Before Maturity, in Good Faith, Without Notice of Defect (Rev. Code 1919, § 1763).**

One who purchases a note from payee or holder having a defective title must, to recover thereon as holder in due course, as provided by Rev. Code 1919, § 1763, show that he acquired the note for value before maturity, in good faith, and without any notice of defect in his transferor's title.

4. **Bills and Notes—Directing Verdict for Holder of Fraudulent Note Is Error, Unless Holder Shows Himself Holder in Due Course (Rev. Code 1919, § 1763).**

A trial court should not direct a verdict for the holder of a note shown to be fraudulent in its inception, unless the holder has successfully assumed the burden of proving his good faith and that he is a holder in due course as provided by Rev. Code 1919, § 1763.

5. **Bills and Notes—Whether Holder of Fraudulent Note Took in Good Faith Held for Jury (Rev. Code 1919, § 1763).**

In suit by one who had obtained a loan through agency of a bank to recover the proceeds of such loan, a part of which proceeds the bank had retained upon a claim they were due as payment for prior notes of the borrower, which notes the borrower claimed were not held in due course by the bank because of their fraudulent character, whether the holder of such fraudulent notes took in good faith as required by Rev. Code 1919, § 1763, held for jury.

6. **Bills and Notes—That Interested Witness Testified Without Contradiction that Note Tainted with Fraud Was Taken by Holder Without Notice and in Good Faith Does Not Justify Directed Verdict for Holder.**

The mere fact that an interested witness testified without being directly contradicted that a note tainted with fraud was taken by the holder without notice and in good faith does not justify the court's directing a verdict for the holder.

7. **Witnesses—In Suit to Recover Loan Proceeds Retained to Pay Prior Note Indebtedness, Refusal to Permit Cross-examination of Holder on Issue of Good Faith in Taking Notes Held Error.**

Where a borrower sued a bank to recover proceeds of a loan, a part of which had been retained by the bank under claim that they were retained to pay prior notes owing to the bank by such borrower, wherein plaintiff claimed such prior notes were not held by the bank in due course, refusal to permit cross-examination of the bank president on the question of the bank's good faith in obtaining the notes, after president had testified he had no knowledge that would have led him to believe there was a defense, held error.

8. **Bills and Notes—Bank Was Not Bona Fide Holder of Notes to Extent of Certificate of Deposit Issued Therefor, if Knowledge of Fraud Was Acquired Before Certificate Was Paid (Rev. Code 1919, § 1758).**

Bank held not holder in due course of notes to extent of certificate of deposit issued therefor under Rev. Code 1919, § 1758, in absence of evidence showing that its president's knowledge of fraud of transferor in securing notes was not acquired until after certificate was actually paid.

Note.—See, Headnote (**1**), American Key-Numbered Digest, Bills and Notes, Key-No. 497(5), 8 C. J. Sec. 1291; (**2**) Key-No. 339, 8 C. J. Secs. 710, 713; (**3**) Key-No. 497(2), 8 C. J. Sec. 1292; (**4**), (**5**), (**6**) Key-No. 537(6), 8 C. J. Sec. 1376; (**7**) Witnesses, Key-No. 269(2), 40 Cyc. 2473, 2476, 2483; (**8**) Bills and notes, Key-No. 334, 8 C. J. Sec. 715.

On effect of fraud in the inception of a bill or note to throw upon a subsequent holder the burden of proving that he is a holder in due course, see annotation in 18 A. L. R. 18; 34 A. L. R. 300; 3 R. C. L. 1033; 1 R. C. L. Supp. 952; 4 R. C. L. Supp. 231; 6 R. C. L. Supp. 214.

For annotations on Rev. Code 1919, Secs. 1758 and 1763, see 5 U. L. A., pgs. 233 and 277.

Appeal from Circuit Court, Douglas County; Hon. R. B. Tripp, Judge.

Action by G. F. Jerke against the Delmont State Bank. Judgment for defendant, and plaintiff appeals from the judgment and an order denying a new trial. Reversed and remanded.

*H. A. Doyle*, of Yankton, and *Bogue & Bogue*, of Parker, for Appellant.

*Wicks & Quinn*, of Scotland, S. D., for Respondent.

MORIARTY, C. This action was brought by the appellant, G. F. Jerke, who seeks to recover from the respondent, Delmont State Bank, the proceeds of a certain real estate loan made to him through the agency of the respondent bank.

There is no dispute as to the making of the loan in the sum of $14,000, but the respondent, in its answer to appellant's demands, says that at the time the loan was made it was holding certain notes of appellant on which the sum of $10,000 and interest was then due. And respondent claims the right to hold sufficient of the proceeds of the loan to satisfy the debt due on said notes.

Appellant says that the $10,000 notes were secured from him by fraud, and he denies that respondent is a holder in due course of said notes.

At the commencement of the trial, the following facts were

admitted: That the notes in controversy were given in a transaction wherein appellant was purchasing certain corporate stock of the Midland Packing Company; that the stock salesman who sold said stock to appellant made to appellant, at the time the notes were given, false and fraudulent representations, which were believed and relied upon by the appellant, and by which appellant's signature to the notes was secured; that the Securities Commission of the state of South Dakota had issued to the Midland Packing Company authority to sell its stock within the state to the amount of $200,000; that prior to the transaction with appellant more than $200,000 worth of said stock had been sold within this state; and that after the sale to appellant the authority to sell within this state was revoked by the Securities Commission.

These admissions narrowed the contentions down to the single question whether the respondent was a holder in due course of these notes signed by appellant.

The case was tried to a jury, and, after the parties had rested, the trial court granted respondent's motion for the direction of a verdict in its favor. Upon the verdict so directed and duly filed, a judgment in respondent's favor was entered. Appellant moved for a new trial. His motion was denied, and, from the judgment and the order denying a new trial, this appeal is taken.

The evidence submitted shows the following facts:

That the notes in controversy are four in number, for the sum of $2,500 each, bearing interest at 8 per cent, and dated August 6, 1919, due one year after date. They read, "I promise to pay to the order of myself," are signed and indorsed by the appellant, and were taken by the respondent bank without further indorsement. These notes were delivered by the appellant to one Hilton, the stock salesman who made the false representations to appellant. The president of the respondent bank testified that he bought the notes from Hilton, paying therefor the sum of $9,900, by delivering to Hilton a certificate of deposit in the sum of $5,000, payable to the Midland Packing Company February 6, 1920, without interest, and a draft for $4,900 drawn on a Sioux City bank, and payable to the order of the Midland Packing Company. This bank officer further testified that he did not remember whether he had ever met Hilton before this transaction or not; that on the first occasion of meeting him Hilton introduced himself. He further

testified that when he bought the notes he had no notice of any
defense existing against them, or any knowledge of any fact that
would lead him to believe that there was any such defense.    He
also testified that before buying the notes he had a phone conver-
sation with appellant in which appellant said the notes were all
right and that he would rather have that bank hold them than some
other bank.   He further testified that at the time he bought these
notes he did not know that Hilton had agreed with appellant to
resell the stock for which the notes were given; that he did not
remember when he first learned of this resale agreement.   He fur-
ther admitted that he afterward learned that some of the trans-
actions of the Midland Packing Company were fraudulent, but did
not remember when he first learned this.   He further testified that
at the time he bought the notes he knew that the stock for which
the notes were given had not been delivered to appellant, but did
not know at that time that the company was engaged in a fraudu-
lent scheme; that they were making all sorts of contracts with
people to get money from them; that they had been reselling stock
for purchasers and paying commission on resale deals.   He testi-
fied that it was several months afterward that he learned of the
fraudulent transactions by the Midland Packing Company.

Appellant in his testimony denied that the bank president called
him up by phone concerning the purchase of the notes, or that he
had any such phone conversation as was testified to by that officer.
He says that it was about 5 o'clock in the afternoon of August
6th when Hilton left appellant's farm about four miles from Del-
mont, where the respondent bank is located, and that about 9
o'clock on the forenoon of the next day, August 7th, he saw Mr.
Shaw, the president of respondent bank, and talked with him near
the bank building; and he says that at that time Shaw told him
that the bank had bought the notes, and he told Shaw of a resale
agreement with Hilton.

The indorsements on the paper show that the draft for $4,900
delivered to Hilton was paid by the Sioux City bank on August 8,
1919.   But the $5,000 certificate of deposit was not indorsed by
the Midland Packing Company until February 10, 1920.

On this appeal counsel for appellant present twelve assign-
ments of error; assignment XII dealing with the denial of the
motion for a new trial, and the other eleven dealing with alleged

errors of the trial court in rulings on objections to evidence and with the directing of the verdict in favor of respondent.

In the interest of brevity, we will treat all assignments under these two heads, to wit, rulings on objections to evidence and direction of the verdict. And for the purpose of a more logical discussion we will first consider the direction of the verdict.

[1]   The admissions made at the opening of the trial establish the undisputed fact that the notes in controversy were secured from the appellant by fraud, and from this, in accordance with the provisions of section 1763 of the Revised Code, the respondent had the burden of proving that it was a holder in due course. In the case of Oschenreiter v. Block, 42 S. D. 154, 173 N. W. 736, this court held that the trial court erred in refusing to direct a verdict for the holder where the defense was that the note was procured by fraud and that the plaintiff was not a holder in due course. The opinion states that evidence was offered tending to show that the note was secured from the defendant by "McDonald's misrepresentation and fraud." McDonald was the one from whom the plaintiff in that case took the note. The note in that case, as in the case now before us, was one payable to the order of the maker and indorsed by him, and the plaintiff showed that he took the note with another note and $50 in cash in payment for an automobile; the discount allowed on the notes not being such as to arouse any suspicion as to the good faith of the transaction. The statement in the decision is silent as to whether the plaintiff testified that he had no actual notice of the fraud in the inception of the note.

[2]   In the decision, Judge Gates, speaking for this court, quotes from section 776 of Daniel on Negotiable Instruments:

"While neither gross negligence, nor knowledge of suspicious circumstances, of itself constitutes bad faith as matter of law, it is evidence from which bad faith may be inferred, and such facts when proven may be considered by a jury in arriving at the ultimate fact of good or bad faith. * * * Bad faith in taking commercial paper, it has been said, does not necessarily involve furtive motives. It may be shown by a willful disregard of and refusal to learn the facts when available and at hand, and, if a purchaser of a note for value before maturity has notice of facts tending to show defenses to the same, he cannot purposely refrain from mak-

ing inquiries as to the inception of the paper, and at the same time claim to be a bona fide purchaser."

[3]   But in section 814 of the same text the author, in discussing the effect of section 59 of the Negotiable Instrument Law, being the same as section 1763 of our Revised Code, says:

"It is generally held that to sustain the burden of proof to show that he acquired title in due course, under the statutory definition, a purchaser from one whose title was defective must show not only that he acquired the note before maturity and for value, but also that he took the same in good faith, and that at the time the instrument was negotiated to him he had no notice of any infirmity therein or defect of title."

These quotations make up what is commonly referred to as the majority rule, and they show that practically the only difference between this and the so-called minority rule consists in the requirement of diligence and inquiry demanded by the latter.

[4]   Of course the trial court should not direct a verdict for the holder of a note shown to be fraudulent in its inception unless the holder has successfully assumed the burden of proving his good faith as defined by the majority rule.

Applying these conclusions to the instant case, the burden of showing good faith was cast upon the respondent by its admission that the note was secured from the appellant by fraud. Appellant at no time had the burden of proving bad faith, after fraud in the inception of the note was established. Shaw, the president of the respondent bank, testified that "at the time he purchased the notes he had no notice of any defense existing against them, nor did he have any knowledge of any fact which would lead him to believe there was any defense to any of these notes."

In the Iowa case of Arnd v. Aylesworth, 145 Iowa 185, 123 N. W. 1000, 29 L. R. A. (N. S.) 638, this question is thoroughly discussed and many authorities cited. The rule there laid down is perhaps best stated in the words of the Massachusetts court there cited (Anthony v. Mercantile, etc., Ass'n, 162 Mass. 354, 38 N. E. 973, 26 L. R. A. 406, 44 Am. St. Rep. 367):

"It is not often, where a party has the burden of proving a fact by the testimony of witnesses, that the jury can be required by the court to say that the fact is proved. They may disbelieve the witnesses."

[5, 6]   This rule has been adopted by this court, as stated in McGill v. Young, 16 S. D. 360, 92 N. W. 1066, and in Union National Bank of Columbus v. Mailloux, 27 S. D. 543, 132 N. W. 168. And, while the rule requiring diligence and inquiry on the part of the holder, heretofore referred to as the minority rule, is adhered to in those decisions, and is no longer the rule of this state, those cases still stand as authority for the doctrine that, where an interested witness testified that a note tainted with fraud was purchased without notice and in good faith, the jury can consider all the circumstances connected with the purchase, to determine the question of good faith. And the fact that the testimony of such witness is not directly contradicted does not justify the direction of a verdict.

These distinctions are of particular importance in the instant case in connection with appellant's contentions as to errors in the rulings of the trial court on the admission of evidence, and we will consider these contentions as affecting the direction of the verdict.

The witness Shaw testified in the most general manner possible that he had no notice of any defense to the notes, nor any knowledge of any fact which would lead him to believe that there was any defense to any of the notes. After having so testified as to the manner in which payment for the notes was made, this witness was asked, on cross-examination, the following questions, each of which was objected to as immaterial and not proper cross-examination, and which objection was in each instance sustained:

"Q.   Well, how had you paid for the other notes that you had bought from this same company prior to this date?"

"Q.   You knew at that time of course, Mr. Shaw, that we had a law in this state, known or commonly known as the Blue Sky Law, did you not?"

"Q.   Had you made any inquiry at that time as to whether or not this Midland Packing Company had complied with what is known as the Blue Sky Law of South Dakota?"

"Q.   Did you make any inquiry of Mr. Hilton or any one else at the time your bought the four notes in suit, as to whether or not the Midland Packing Company had complied with the Blue Sky Law of South Dakota?"

"Q.   At this time, Mr. Shaw, how many of the Midland Packing Company agents had you dealt with in the purchase of notes other than Mr. Hilton?"

"Q. Now, shortly after the purchase of these notes, Exhibits I, 2, 3, and 4, you entered into a contract yourself with the Midland Packing Company, did you not, whereby you executed and delivered to them certain promissory notes, and wherein they agreed to resell your stock, and out of the proceeds of that resale pay your notes, and to divide the profits with you?"

"Q. Did you have a written contract with the Midland Packing Company entered into a short time after the purchase of the notes in question in this case?"

"Q. At the time you purchased these notes in suit here, Exhibits I, 2, 3, and 4, had you been down to Sioux City to examine the Midland Packing Company plant?"

"Q. At that time had you talked with any of the officers of the Midland Packing Company?"

"Q. Did you ever meet, that is, prior to the purchase of these notes, any of the officers of the packing plant at Sioux City, that is, Ben Salinger, Mr. Burlingame, Mr. Sawyer, or Tom G. Taylor?"

[7] The learned trial court erred in sustaining the objections to these questions. When the witness had testified to his conclusion that he had no knowledge of any fact that would lead him to believe that there was any defense to any of the notes, it was then the privilege of opposing counsel to cross-examine him fully as to all his transactions with the Midland Packing Company, its officers and agents, so as to enable the jury to draw its own conclusion as to the good faith of the transaction.

It is true, as respondent's counsel argue, that appellant might have called this witness for cross-examination under the statute, or he might have made an offer of proof. But, as he had the right to cross-examine on these points, appellant was not compelled to resort to either of those expedients in order to protect his rights.

[8] But there is another point presented by the exceptions to the directed verdict. This is based upon the fact that the record shows that the certificate of deposit for $5,000, issued as part payment for the notes, remained in the hands of the Midland Packing Company for more than six months after it was issued. The witness Shaw testified that appellant told him of the resale agreement some time after the purchase of the notes but cannot state how long thereafter. This witness also admitted that he

learned that the Midland Packing Company was making this class of contracts with people generally in that vicinity, and he testified that he could not remember how long after the purchase of the notes he got this information. He admits that he learned that certain transactions of the Midland Packing Company were fraudulent, but says that he cannot remember when he got that information.

·Section 1758 of our Revised Code provides:

"Where the transferee receives notice of any infirmity in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him."

While the $5,000 certificate of deposit was negotiable in form, so long as it remained in the hands of the Midland Packing Company it merely established the relation of debtor and creditor between the payee and the respondent bank. If Shaw, the president of the bank, learned of fraud in the inception of the appellant's notes before this certificate was actually paid, or before the bank became bound to pay it by its transfer to a holder in due course, then the bank became subject to the provisions of section 1758, above quoted, and to the rule laid down in Union National Bank v. Mailloux, 27 S. D. 543, 132 N. W. 168, that a bank discounting a note and merely crediting the payee with the proceeds thereof is not a purchaser for value unless it shows that the amount credited to the payee was withdrawn by him prior to the bank receiving any notice of facts invalidating the notes.

With the record showing that this $5,000 was not actually paid until after February 12, 1920, and the bank president failing to show that his knowledge of the payee's fraud in similar transactions was not acquired until after the certificate was actually paid, it was error on the part of the learned trial court to direct a verdict allowing the respondent to withhold the full amount of the notes and interest from appellant's funds in its hands.

For the errors indicated, the judgment and order appealed from should be reversed and the case remanded for a new trial.

Reversed and remanded.

POLLEY, SHERWOOD, and BURCH, JJ., concur.

CAMPBELL, P. J., concurs in result.

GATES, J., not sitting.