JERKE, Appellant, v. DELMONT STATE BANK, Respondent.

(223 N. W. 585.)

(File No. 5440. Opinion filed February 8, 1929.)

For former opinion, see 51 S. D. 623, 216 N. W. 362.

*H. A. Doyle,* of Yankton, and *Bogue & Bogue,* of Parker, for Appellant.

*Wick & Quinn,* of Scotland, S. D., for Respondent.

CAMPBELL, J. Plaintiff instituted this action to recover from defendant bank the sum of $14,000 and interest, alleged to be the proceeds of a real estate loan negotiated by defendant bank for plaintiff. Defendant bank admitted the negotiation of the loan and the receipt of the proceeds thereof, but by way of counter-claim maintained that it was lawfully entitled to retain out of such proceeds of loan the sum of $10,828.80, being the amount due and unpaid upon four certain promissory notes executed by plaintiff and owned and held by the defendant bank. The plaintiff's reply, in substance, admitted the execution of the notes in question, but alleged that they were given in payment of the purchase price of capital stock of Midland Packing Company, a corporation, and that they were procured by false and fraudulent representations, and upon a promise that they would not be negotiated, but would be held and paid out of the proceeds of a resale of the same capital stock, and that defendant bank, at the time of acquiring said notes, had knowledge of such fraud and such promise.

The real issues between the parties developed upon the pleadings and at the trial in exactly the same manner as though the defendant bank, as plaintiff, had sued Jerke, the actual plaintiff, upon four notes, and he had defended upon the grounds of fraud in the inception of the notes, and that the bank never became a holder thereof in due course, and consequently could not collect, in the face of proof of fraud in the inception of the notes, and the burden of proof in this case upon all issues is just what it would have been, if the case had so arisen. The case was tried to a court and jury, and at the close of all the testimony the learned trial judge directed a verdict in favor of the defendant bank sustaining their claim of right to deduct and hold from the loan proceeds a sufficient amount to pay the notes in question, and judgment was thereon entered, and appeal taken to this court, as a result of which appeal the judgment below was reversed; the opinion of this court being found in 51 S. D. 623, 216 N. W. 362, where the facts in the case are set out at length.

For our present purposes it is sufficient to state that the promissory notes in question were executed on August 6, 1919, being four notes in the aggregate principal sum of $10,000, due one year after date, with interest at 8 per cent. Fraud in the inception of the notes was stipulated at the trial. The undisputed evidence

showed that the notes were purchased by defendant bank on the day of their execution, or the next day, for the sum of $9,900; the payment being made by means of a draft in the sum of $4,900, drawn on a Sioux City bank, and promptly presented for payment, and paid in due course, and a certificate of deposit, negotiable in form, to the order of Midland Packing Company for the sum of $5,000, payable February 6, 1920, without interest.

In our former opinion we held, in substance, first, that fraud in the inception of the notes having been admitted, the burden of proof in the strict and proper sense of the phrase (that is, the duty of establishing conviction on the ultimate issues in the mind of the trier of the facts, as contradistinguished from the duty of advancing at any given stage of the case with the production of evidence [see 22 C. J. p. 67; Chamberlayne, Modern Law of Evidence, § 936; Jones, Commentaries on Evidence (2d Ed. Bancroft-Whitney, 1926) § 481; Wigmore on Evidence (2d Ed.) §§ 2495-2499]) was upon the plaintiff to establish by a fair preponderance of the evidence that it was a holder in due course; second, that the trial judge erred in directing a verdict; third, that prejudicial error was committed by sustaining objections to certain questions asked by the plaintiff of the witness Shaw, who was president of defendant bank; and, fourth, that if defendant bank learned of the fraud in the inception of the notes after purchasing the same, but before the $5,000 certificate of deposit was either actually paid or was transferred by Midland Packing Company to a holder in due course, then to the extent of the amount of that certificate defendant bank could not be a due course holder of the notes in question, by virtue of section 1785, Rev. Code 1919, regardless of its good faith and lack of notice at the time of the purchase.

Respondent bank applied for rehearing, maintaining the position in its application that we erred in the rules of law announced in the former opinion, or some of them, and in the application thereof to the case, and likewise that in such former opinion we made statements as to the facts which were more unfavorable to respondent bank than the evidence justified. Rehearing was granted, and the case has been orally reargued by counsel for both parties, and we have very carefully reviewed and reconsidered the entire matter.

We will first consider the holding of our former opinion

as to the burden of proof resting upon respondent bank. Section 1763, Rev. Code 1919 (section 59, N. I. L.), provides as follows: .

"*Prima Facie Holder.* Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he acquired the title as a holder in due course. But the last mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

In the instant case defect in the title of the instrument by the person negotiating it to respondent bank was admitted by stipulation whereby the section became applicable to the situation, and we held squarely in the former opinion, although without discussing the precise point, that the burden of proof to establish due course holding, which the statute above quoted imposes under such circumstances upon holder of the instrument, was the actual burden of proof, and not merely what is now more commonly called the burden of evidence. We are satisfied with the correctness of our holding upon this point. It is the rule announced by this court in Continental & Commercial Bank v. Jefferson (1927), 51 S. D. 477, 215 N.W. 533, and it was the rule in this state prior to the adoption of the Negotiable Instruments Law (Rev. Code 1919 §§ 1705-1905). See Landauer v. Sioux Falls Imp. Co. (1897), 10 S.D. 205, 72 N.W. 467, which has had the subsequent approval of this court on this point in at least the following cases: Jamison v. McFarland (1898), 10 S. D. 574, 74 N. W. 1033; Dunn v. National Bank of Canton (1898), 11 S. D. 305, 77 N. W. 111; McGill v. Young (1902), 16 S. D. 360, 92 N. W. 1066; Union National Bank v. Mailloux (1911), 27 S. D. 543, 132 N. W. 168; Kirby v. Berguin (1902), 15 S. D. 444, 90 N. W. 856; Rochford v. Barrett (1908), 22 S. D. 83, 115 N. W. 522; Mee v. Carlson (1908), 22 S. D. 365, 117 N. W. 1033, 29 L. R. A. (N. S). 351; Barnard v. Tidrick (1915), 35 S. D. 403, 152 N. W. 690.

A minority of the courts take the view that the words "burden to prove," in the statute, in substance mean only burden to proceed with the introduction of testimony, and that when defective title is shown it becomes the duty of the holder of the note to proceed to introduce sufficient evidence to establish prima facie its due course holding, but that the ultimate and actual burden of proof in the

case is upon the party defending against the note to convince the mind of the trier of the facts that the holder of the note was not in fact a due course holder. This view is very well exemplified in the Missouri case of Downs v. Horton (1921), 287 Mo. 414, 230 S. W. 103. It is maintained also by the courts of Alabama, and seems to have had the approval of at least some of the cases in Kansas, Montana, and Oklahoma. It is advocated as the sounder view upon principle by some masters of the theory of law of bills and notes. See Brannan, Negotiable Instruments Law (4th Ed.) p. 534; 33 Harvard Law Rev. p. 274. The opposing view, however, is sustained by the overwhelming weight of authority, numerically speaking. It is well exemplified by the language of the court in the Utah case of Leavitt v. Thurston (1911), 38 Utah, 351, 113 P. 77, as follows: .

"The appellant, however, urges that the burden, cast upon him when fraud was shown in the inception of the note, was discharged by the giving of his testimony that he purchased the note in good faith for value before maturity in the usual course of business and without notice of the fraud; and that the burden then shifted to the defendant to show that the plaintiff took the note with knowledge or notice of the fraud. Here counsel confuse the term, 'burden of proof'—the onus probandi—which does not shift, with that of the 'burden or duty of proceeding,' or going forward, which in the course of the trial upon various facts may, and frequently does, shift from one party to the other. Whenever the existence of any fact or facts is necessary in order that a party may make out his case or establish a defense, the burden of proof—the onus probandi—is on such party to show the existence of such fact or facts. That burden does not shift and is unaffected by the evidence as the trial proceeds. After all the evidence is in, the one having the burden will lose unless the evidence bears more heavily in his favor. Upon proof of fraud in the inception of the note, the statute undoubtedly casts on the holder, not only the mere duty or burden of proceeding or of going forward, but the burden of establishing the existence of facts showing that he, or some person under whom he claims, acquired title as a holder in due course, and as defined in section 1604 [Comp. Laws 1907], which includes the fact that at the time the note was negotiated he, or the person through whom he acquired title, had no notice of the fraud or

infirmity. If evidence is given by him tending to show that he was such a holder in due course, that does not then shift the burden of proof to the defendant to establish the fact that he, or the person from whom he acquired title, had notice or knowledge of the fraud, or that no value was paid for the note, or that it was purchased overdue, but merely the duty of proceeding in the production of evidence if he desires to meet or overcome the effect or weight to be given the evidence so adduced by the holder. But, upon all the evidence on such issue, the holder will lose unless the evidence bears more heavily in his favor. We think the charge in this particular was right."

The cases pro and con upon the point will be found collected in Brannan, Negotiable Instruments Law (4th Ed.) pp. 516-538; Uniform Laws Annotated, vol. 5, note at p. 278; and in case notes in 18 A. L. R. 18, and 34 A. L. R. 300. We believe the majority view to be sound in principle, in addition to having the support of far the greater number of authorities, and we are satisfied that our former opinion was correct in its holding upon this point.

■ We come, now, to consider the holding of the former opinion with reference to rulings of the trial judge sustaining objections to questions propounded by appellant to the witness Shaw, president of respondent bank. The questions which were not permitted to be answered are set out in our former opinion, as reported in 216 N. W. 362, at page 365, and, without going into detail as to each of the questions, it is sufficient to say that we are of the opinion that in refusing to permit these questions to be answered the trial judge restricted appellant unduly. It is not, perhaps, precisely speaking, a case of refusing offered evidence. Fraud in the inception of the notes was admitted, and the issue was whether or not respondent purchased the notes in good faith and without notice. At the time these questions were propounded, the witness Shaw had already stated that the notes were negotiated by one Hilton; that he knew at the time he purchased the notes that Hilton was an agent and stock salesman of Midland Packing Company; and that the notes had been given in payment for the capital stock of that corporation. It was the duty of respondent bank to disclose fully and fairly all the circumstances connected with and surrounding its acquisition of the notes in question, and it was the privilege of appellant to go into that matter fully and in

detail, and any undue restriction of that right could hardly be held to be error without prejudice. This court has frequently had occasion to make mention of the extreme liberality which should be permitted in cases of this kind. See First National Bank v. Harvey (1912), 29 S. D. 284, 137 N. W. 365. See, also, on this point, Morrill v. Jones (1920), 26 N. M. 32, 188 P. 1108.

Under our statute (section 2714, Rev. Code 1919), Shaw, being an officer of the respondent bank, which was a party to the record, plaintiff had the right to call him as an adverse witness and examine him "as if under cross-examination" with reference to any and all material matters. Respondent makes quite a point of the fact that plaintiff in this case did not at any time call the witness Shaw to examine him as an adverse witness "as if under cross-examination," but that the questions hereinbefore referred to, which the court did not permit to be answered by the witness Shaw, were asked of him in the course of the usual and customary cross-examination, he having been called by the defendant as its witness and put upon his direct examination in support of its claim of due course holding.

It is the contention of respondent that the questions objected to were not proper cross-examination under those circumstances, in that they were beyond the scope of any matter brought out by questions propounded to this witness upon his direct examination. Respondent maintains that, assuming plaintiff had any right to make these inquiries of the witness Shaw at all (a thing which we understand respondent does not concede), it could only be done by calling him as part of plaintiff's own case upon the issue as an adverse witness. Respondent contends in substance that section 2714, Rev. Code 1919, does not operate to extend the right to cross-examine an adverse party beyond the usual limits (that is, going to matters brought out by the direct examination), when he has offered himself as a witness in support of his own case and has testified directly thereto, and that at such stage of the proceedings the cross-examination should be limited, as cross-examination usually is, to matters brought out by the direct examination, and that, if the opposing party desires to examine the witness "as if under cross-examination" with reference to matters not brought out by his direct testimony, the proper and orderly way to accomplish that result is to wait until the time comes to put in their

own case, and then call such party as an adverse witness, under the statute, and examine him "as if under cross-examination" as to any material issues. Certainly, this is the orderly and technically correct course of procedure, the one that makes for the avoidance of confusion, and the one that should properly be followed.

In this case, however, we are of the opinion that some of the inquiries, at least, were, as a matter of fact properly within the scope and limits of matters concerning which the witness had testified upon his direct examination. Further, it appears to us upon the record that the objections of counsel and rulings of the court as to these questions were made and considered by all parties as being made upon the actual merits, and not upon the mere procedural situation. In other words, as we read the record, the court upon these questions did not rule merely that they were not proper cross-examination of the witness Shaw at that stage of the proceedings, because they were beyond the scope of his direct examination, and that the real right to propound them could only be raised at a later stage of the proceedings, by calling Shaw as an adverse witness when plaintiff came to put in his case; but the court, by its rulings, held, and meant to hold, and was understood by counsel to hold, in substance, that the inquiries were beyond the issues, and could not properly be propounded to the witness Shaw by the plaintiff at any stage of the proceedings. Under these circumstances, it would, we think, be highly artificial to hold that plaintiff could not avail himself of these rulings, merely because he did not thereafter, when putting in his own evidence, call Shaw as an adverse witness under the statute, and propound the same questions and take the same rulings over again. We are therefore of the opinion that the undue limitations imposed by the court upon the cross-examination of the witness Shaw requires that the case be reversed and remanded for a new trial.

We are not satisfied, however, with reference to two other matters dealt with in our former opinion, and claimed by respondent on rehearing to have been erroneously treated therein, namely, the matter of directing a verdict and the matter of the $5,000 certificate, and we do not think the retrial should proceed in the light of what we stated in the former opinion with reference to those two propositions, and we are therefore compelled further to consider them at this time.

We will examine first the matter of our former holding with reference to the directed verdict. The former opinion held, in substance, that it was error to direct a verdict in the light of rulings of the trial court excluding answers to certain questions, and in the light of the $5,000 certificate matter, and perhaps did not purport to pass squarely and definitely upon the matter of direction of verdict in this case, considered separately and apart from such additional matters; but the former opinion did purport to lay down a general rule or doctrine with reference to direction of verdicts in the following language:

"* * * Where an interested witness testified that a note tainted with fraud was purchased without notice and in good faith, the jury can consider all the circumstances connected with the purchase, to determine the question of good faith. And the fact that the testimony of such witness is not directly contradicted does not justify the direction of a verdict."

We conceive this to be a matter of no inconsiderable importance. Direction of a verdict in a case such as the one at bar does not stand upon any other or different footing from direction of a verdict in favor of the party having the burden of proof in any other litigation. The credibility of an interested witness does not, in general, depend upon the nature of the facts wherein he is interested and concerning which he is testifying. There is no logical reason to place the testimony of an interested witness with reference to the purchase of a note on any different ground from his testimony with reference to anything else. There is no logical reason to assume that the scales between self-interest and righteousness will weigh in one direction if the transaction under investigation is the purchase of a promissory note, and in the other direction if it is the purchase or sale of an automobile or the making of any other business contract.

The language last above quoted implies by fair inference the existence of some rather vague, general doctrine or principle, existent as a matter of law, to the effect that, where the case of a party having the burden of proof depends in whole or in part upon the testimony of an interested witness, the credibility of such witness is a question for the jury, and it is not proper to direct a verdict. We do not believe that any such general principle or doctrine exists, and we are of the view that by the language above

quoted in the former opinion, and by the quotation therein made from the Massachusetts case of Anthony v. Mercantile, etc., Association (1894), 162 Mass. 354, 38 N. E. 973, 26 L. R. A. 406, 44 Am. St. Rep. 367, we placed an undue and improper restriction upon the right, and indeed the affirmative duty, of the trial judge to direct a verdict in a proper case in favor of the party who has the burden of proof, but has clearly sustained it to such a degree that it would be unreasonable to think otherwise.

It is the theory of our law that the entire matter of a trial between parties shall be carried on in a court of justice and under the general supervision and control of the judge thereof, and that the truth as to the facts shall be arrived at upon a consideration of the evidence and proofs presented by the respective parties in support of their respective claims. The jury, in modern law, is merely a part of the machinery of the court, and it is the part of such machinery that is made use of in proper cases for determining the truth as to the issuable facts. But we must not forget that the general superintendence and control of the court and all its machinery, including the jury, rests with the judge, and it is fundamental that an issue arising between litigants must be tried by a general, rational, or reasoning process, both as to the ascertaining of facts and the application of the law. This has been the basic theory of the common law ever since the rule of reason replaced trial by ordeal and wager of battle. The existence or nonexistence of ultimate issuable facts must be determined from the evidence produced in court, whether the determination is made by a judge or by a jury, by a process of rationalization and judgment, and by the application of the thinking faculties of the human mind to the evidence.

We are too often prone to exaggerate the powers and privileges of a jury as a trier of facts. We frequently see the phrase, "It is for the jury to say what the facts are." Historically speaking, this may have been true in the sixteenth century, but it has long since ceased to be true. The power and right and duty of the jury is not "to *say* what the facts are," but to adjudge and determine what the facts are by the usual and ordinary intellectual processes; that is, by applying the thinking faculties of their minds to the evidence received and the presumptions existing in the case, if any, and thereby forming an opinion or judgment. The data is

the evidence received in court, and nothing extraneous thereto should enter into the determination, except to the extent that the sum of the past experiences of any individual always and necessarily, as a matter of psychology, enters into his formation of judgment or opinion based upon any given data. Before there is anything for submission to a jury, the evidence offered as to the ultimate facts must be such that the application of normal intellectual faculties thereto might by the customary and normal processes of reasoning arrive at different judgments or conclusions. If there is not such a state of facts a verdict should properly be directed, inasmuch as any result but one would not be a reasonable result, and the direction of a verdict in a proper case is not only the right of the judge, but it is his affirmative duty, and just as much and just as proper a part of his duty as ruling upon evidence or performing any other judicial function.

Professor Thayer, in his Preliminary Treatise on Evidence (page 208), states this duty of the judge in this language:

"Especially has this function come into play in supervising and regulating the exercise of the jury's office. Herein lies one of the most searching and far-reaching occasions for judicial control —that of keeping the jury within the bounds of reason. This duty, as well as that of preserving discipline and order, belongs to the judge in his mere capacity of presiding officer in the exercise of judicature. Reason is not so much a part of the law, as it is the element wherein it lives and works; those who have to administer the law can neither see, nor move, nor breathe without it. Therefore, not merely must the jury's verdict be comformable to legal rules, but it must be defensible in point of sense; it must not be absurd or whimsical. This of course, is a different thing from imposing upon the jury the judge's own private standard of what is reasonable. For example, when the original question for the jury is one of reasonable conduct, and a court is called on to revise the verdict, the judges do not undertake to set aside the verdict because their own opinion of the conduct in question differs from the jury's. They are not an appellate jury. The question for the court is not whether the conduct ultimately in question, e. g., that of a party injured in a railway accident, was reasonable, but whether the jury's conduct is reasonable in holding it to be so; and the test is whether a reasonable person could, upon

the evidence, entertain the jury's opinion. Can the conduct which the jury are judging, reasonably be thought reasonable? Is that a permissible view?"

See, also, Wigmore on Evidence (2d Ed), § 2495.

At this point we state, by way of parenthesis, that in what is said herein regarding direction of verdicts we refer, of course, to civil cases. It seems to be of the spirit of our institutions that a jury in a criminal case has an inherent right to act as illogically and unreasonably and arbitrarily as to the members thereof may seem good, and this has never been more nearly brought into question than by the opinion of Mr. Justice Holmes (four justices dissenting) in Horning v. District of Columbia (1920), 254 U. S. 135, 41 S. Ct. 53, 65 L. Ed. 185.

 If reasonable minds could arrive at but one conclusion from the evidence, by applying their intellectual processes thereto, then the question as to whether the party having the burden of proof has established the issuable facts in that particular case is a question to be decided by the judge, and not by the jury, and it is probably a mere matter of phraseology and definition of terms in such a case whether we say, as a matter of language, that it then becomes a question of law for the court, or whether we say that, being a question of fact upon which reasonable minds could not differ, it is such a question of fact as will be decided by the judge, and not by the jury, though undoubtedly the latter phrasing is more accurate. The only objection thereto is that it seems to conflict with the words so often used in the books since Lord Coke first quoted, "Ad quæstionem facti non respondent judices, ad quæstionem juris non respondent juratores," namely, that "questions of fact are for the jury." Like most glittering generalities, this statement, to borrow the expression of Professor McBain, is "weak and infirm of its own generality."

Granting that it may have been true at a time when the function of jurors was to report the facts to the court of their own knowledge, it has not been true since the days, now more than 200 years, when it came to be the function of the jury to determine the facts by applying the reasoning processes of their minds to the evidence brought into court. Jurors do not determine all questions of ultimate fact, even in jury cases. They determine the existence or nonexistence of those facts, and those only, with refer-

ence to the existence of which the judgment of reasonable men might differ as a result of the application of their intellectual faculties to the evidence. If the proof offered by the party having the burden in support of the existence of ultimate issuable facts is so meager that a reasonable mind could not therefrom arrive at the existence of such ultimate fact, there is nothing for the jury, and the judge not only may, but should, direct a verdict against the party having the burden of proof. This is the ordinary case of directing a verdict against the party having the burden of proof, because of the insufficiency of the evidence, and with this no courts seem to have had any difficulty. On the other hand, it is just as true that, if the party having the burden of proof offers such evidence in proof of the existence of the ultimate issuable fact that a reasonable mind functioning thereon could not escape the inference, or conclusion, or opinion, or judgment that such fact existed, then here too is left no question for the jury, and the judge should direct a verdict in favor of the party having the burden of proof. Here, also, courts for the most part have had little difficulty. The general procedure is laid down, and the language used by the courts indicated, in 26 R. C. L. 1073.

A few courts, very considerably in the minority, however, seem here to have been troubled with the matter of credibility of witnesses. The factor of credibility less frequently enters into the direction of a verdict against a party having the burden of proof, because in such cases the credibility is usually assumed, or at least not brought into question. But the entry of the factor of credibility, either one way or the other, can make no difference in the operation of the fundamental principle which necessarily underlies the direction of verdicts in all cases. The question of whether reasonable minds could arrive by reasoning processes at more than one opinion or conclusion is always a question for the judge. The entry of the factor of credibility means simply the existence of one more item upon which the intellectual faculties are to operate. Of course, as the items to be reasoned upon increase in number, the likelihood of there being but one possible reasonable result mathematically diminishes; but, when that situation does exist, it should not be affected by the fact that credibility is also involved.

A jury has no greater or better right to act arbitrarily or unreasonably in forming a judgment or opinion as to whether or not

a witness speaks the truth than it has to act unreasonably in arriving at any other opinion or conclusion. Forming an opinion as to credibility should be just as much a process of rationalization or reasoning from the data presented in the light of human experience as the formation of any other opinion or judgment in a court, and this has always been recognized by the great majority of the courts, and the proposition, subject to various qualifications, has been laid down in some such phrasing as that "the positive testimony of a disinterested, uncontradicted witness cannot be arbitrarily or capriciously disregarded by the jury." See a number of the older cases collected in a note in 81 Am. Dec. at page 268.

Pursuing the matter somewhat further, we come to the precise question involved in the instant case, where the party having the burden of proof depends for establishing the existence of the ultimate fact, either in whole or in part, upon the oral testimony of a witness who is interested in the transaction.

The answer to this question does not state any rule of law, but merely announces a determination of logic or reason. The only rule of law involved is that which announces that the judge will determine the matter without the assistance of the jury, when reasonable minds applied to the evidence could properly come to but one conclusion. The legal principle is simple, and the real question in every case is not a question of law in any proper sense of the word, but is a question of logic, or reason, or judgment, however we may choose to phrase it, and it is in each case a question for the judge (or for the appellate court, as the case may be), and must remain such a question, regardless of the admitted fact that there is no external standard or yardstick whereby we may determine with mathematical precision what result reasonable minds must arrive at in the field of opinion or judgment, by the application of their intellectual faculties to certain given data. The standard of reasonableness is subjective, and it is the standard of the judge that must be used; probably in the final analysis the standard of the court of last resort in any given jurisdiction; but the nature of determination remains the same. When a court holds in any given case or upon any given facts, that the direction of a verdict is proper, it is not in any strict sense announcing a rule or doctrine of law, but is merely announcing its judgment or opinion as a matter of reason and logic that in that case and upon those

facts reasonable minds could not differ as to the result to be reached.

Our question further narrows to this then: Ought a judge to say, as a matter of reason and judgment, that the mere fact that a witness is interested in the matter in controversy, in and of itself, without regard to other circumstances of the case, makes it reasonable to disbelieve or to fail to believe his testimony, in the light of general human experience? We do not believe that any court has gone so far as to lay down any such doctrine, or enunciate any such general principle, whether it be viewed as a matter of law, or as a matter of logical rationalization. The sound view seems to us to be this: That each case must depend upon its own facts, and that the mere fact of interest in the controversy does not, in and of itself, and apart from other circumstances appearing in the case, render it a reasonable thing to disbelieve the testimony of a witness whom otherwise it would be unreasonable to disbelieve, and this, we think, is the established practice of the great majority of courts.

Massachusetts, which was cited in support of the doctrine enunciated in our former opinion, probably goes farther than any other court in limiting the right of a judge to direct a verdict in favor of the party having the burden of proof, where the testimony of an interested witness is involved; in other words, in holding in substance that the mere fact of interest, in and of itself, renders it reasonable to disbelieve a witness.

In the case of Anthony v. Mercantile, etc., Association (1894) 162 Mass. 354, 38 N. E. 973, 26 L. R. A. 406, 44 Am. St. Rep. 367, the Massachusetts court used the language quoted in our former opinion, to wit: "It is not often, where a party has the burden of proving a fact by the testimony of witnesses, that the jury can be required by the court to say that the fact is proved. They may disbelieve the witnesses." And by 1915 the Massachusetts court had arrived to the point of saying in Phillips v. Eldridge (1915) 221 Mass. 103, 108 N. E. 909, as follows: "When testimony warranting a finding that the plaintiff was a holder in due course of a note originating in fraud is given by witnesses called by the plaintiff, it is settled that a verdict cannot be directed for the plaintiff as matter of law."

The courts of Indiana and Texas would go almost, though apparently not quite, as far as the Massachusetts court in this direc-

tion. See Woodsmall v. Myers (Ind. App. 1927) 158 N. E. 646; Pope v. Beauchamp (1920) 110 Tex. 271, 219 S. W. 447, followed by the Court of Civil Appeals of Texas as a binding precedent, but with evidences of considerable lack of enthusiasm, in Caldwell v. McGarvey (1926) 285 S. W. 859. And perhaps the court of North Carolina would go almost this far, as indicated by the case of Smathers & Co. v. Toxaway Hotel Co. (1915) 168 N. C. 69, 84 S. E. 47.

A majority of the courts, however, have announced other views on this question, indicating in substance the view that it is not a reasonable thing to say, in general, that a witness has perjured himself or has testified falsely, either intentionally or unintentionally, merely because of an interest in the case, where his testimony is not contradicted, is not opposed to general human experience, is not inherently improbable, and is not put in question by other circumstances appearing in the case; and the majority of the courts have held that a judge may and should direct a verdict in a proper case for the party having the burden of proof, even though the facts were established, in whole or in part, by the testimony of the party himself or an interested witness.

The Iowa court, in the case of Arnd v. Aylesworth (1909) 145 Iowa, 185, 123 N. W. 1000, 29 L. R. A. (N. S.) 638, seemed to lay down a rather strict rule; but a reading of that opinion makes it plain that, in fact, other circumstances in the case did tend to cast doubt upon the testimony of the interested witness, and the Supreme Court of Iowa has had further occasion to consider the matter, and has not followed the inferences which might have been drawn from its language in the case of Arnd v. Aylesworth. See Second National Bank v. Scanlon (1923) 196 Iowa, 1305, 196 N. W. 65.

In First National Bank of Fairfield v. Dutton (1925) 199 Iowa, 468, 202 N. W. 228, the Iowa court said:

"We have intimated, if not decided, in some of our cases, such as Connelly v. Greenfield Sav. Bank, 192 Iowa, 876, 185 N. W. 887, and Arnd v. Aylesworth, 136 Iowa, 297, 111 N. W. 407, and kindred cases, that although the officers specifically denied notice, yet at least its credibility is for the jury, hence making a jury question. If these pronouncements were followed to the conclusion contended for by appellant, then, in every case where prima facie case

of fraud is made by defendant, thereby casting the burden on the plaintiff to show that it was an innocent purchaser, it would have to go to the jury on the question of the credibility of witnesses tendered to establish that plaintiff was an innocent purchaser. We refuse to acquiesce in any such construction of that line of cases. * * * We deem the correct rule to be that where the bank, being a corporation, attempts to establish itself as an innocent purchaser, that it must negative notice first, by the officer or employee who had the transaction in charge of purchasing the paper, second, by any other officer of the bank who had to do with said transaction, or who had knowledge that such a transaction was under consideration or contemplation, and, if notice be squarely negatived by these parties, their testimony is uncontradicted and the circumstances shown in the case do not tend to impeach their testimony, then the court will be warranted in holding, as a matter of law, so far as this question is concerned, that the bank was an innocent purchaser."

In Idaho, in the case of Southwest National Bank v. Lindsley (1916) 29 Idaho, 343, 158 P. 1082, the court said:

"Since Neal's testimony clearly shows that the transaction in the purchase of said note was made by himself and that none of the other officers of the bank knew anything about the transaction, the jury was not at liberty to ignore this testimony entirely when there was nothing in conflict with it and the witness had not been impeached. It was amply sufficient to prove that the bank acquired said note as a holder in due course. While the jury is the judge of the evidence and the weight that should be given to it, it is not at liberty to ignore entirely evidence where there is no conflict in it and where there is nothing to indicate that the witness was testifying falsely."

See, also, First Nat. Bank v. Pond (1924) 39 Idaho, 770, 230 P. 344.

The Kansas court says:

"Where, because of fraud in the inception of a note, the plaintiff has the burden of proving that he is a holder in due course, the question whether he has met the requirement is ordinarily one for the jury. Trust Co. v. Gill, 113 Kan. 261, 270, 214 P. 413. There is, however, an exception to this general rule recognized by this and many other courts which has been thus expressed: 'Unless

that evidence is so clear and unequivocal as to leave no room for difference of opinion concerning it among fair-minded men.' Beachy v. Jones, 108 Kan. 236, 195 P. 184. That situation arises where the plaintiff accounts for his good faith ownership by evidence which is not intrinsically improbable, and is not contradicted or impeached by, or inconsistent with, other evidence or inferences fairly to be drawn therefrom." Pioneer Trust Co. v. Combs (1924) 117 Kan. 89, 230 P. 302.

In the recent Oklahoma case of Liberty National Bank of Pawhuska v. Kendall (1925) 113 Okl. 140, 240 P. 72, the burden was on plaintiff to prove that it was a holder of a note in due course, and plaintiff relied in large part upon the testimony of its cashier, Riley, and the appellate court, in holding that the trial court should have directed a verdict for the plaintiff, said:

"The evidence of the plaintiff's witness Riley being uncontradicted, and not inherently improbable either in itself or when taken in connection with circumstances surrounding the transaction, the jury were not at liberty to disregard it. Hamilton v. Blakeney, 65 Okl. 154, 165 P. 141. In fact, there was no evidence to submit the question of innocent purchaser to the jury because the evidence of the plaintiff was not improbable, nor were there any circumstances or facts taken in connection with the purchase of the note that would impute knowledge of the plaintiff that the note was defective."

Additional cases lending support to the views last above quoted on this question, among others, are the following: Piper v. Neylon (1911) 88 Neb. 253, 129 N. W. 277; Asbury v. Taube (1912) 151 Ky. 142, 151 S. W. 372; Fisk Rubber Co. v. Pinkey (1918) 100 Wash. 220, 170 P. 581; Kelly v. Jones (1919) 290 Ill. 375, 125 N. E. 334, 8 A. L. R. 792; Central Sav. Bank v. Wachman (1922) 221 Mich. 512, 191 N. W. 5; U. S. Mtg. Co. v. Hotel Radisson Co. (1924) 161 Minn. 231, 201 N. W. 318; White v. McGehee (1924) 165 Ark. 614, 261 S. W. 636; Am. Surety Co. v. Palmer (1924) 211 App. Div. 172, 206 N. Y. S. 817.

If we examine the prior holdings of this court on the point, we find that, while the matter has never been discussed in detail, it has been the practice of this court, and we believe properly, to consider each case upon its particular facts, and this court has never followed those courts who hold, as illustrated by the view of the

Massachusetts court, that the mere fact that the case of the party having the burden of proof rests in whole or in part upon the testimony of an interested witness necessarily or of itself requires the matter to be presented to a jury.

In some cases, where the matter was submitted to a jury and the jury returned a verdict against the holder, this court has held that the evidence justified such verdict, without any attention to or discussion of the question of whether or not in such case there could under any circumstances be a directed verdict. Examples of such holdings are Rochford v. Barrett (1908) 22 S. D. 83, 115 N. W. 522; Mee v. Carlson (1908) 22 S. D. 365, 117 N. W. 1033, 29 L. R. A. (N. S.) 351; Barnard v. Tidrick (1915) 35 S. D. 403, 152 N. W. 690.

In the cases of Kirby v. Berguin (1902) 15 S. D. 444, 90 N. W. 856, McGill v. Young (1902) 16 S. D. 360, 92 N. W. 1066 (cited in the former opinion in this case), and Union National Bank v. Mailloux (1911) 27 S. D. 543, 132 N. W. 168, this court indicated in each case that a verdict should not be directed for the plaintiff; but it was not in any of these cases merely because of the fact that plaintiff's case depended upon the testimony of interested witnesses, and the court did not in any of these cases follow the Massachusetts rule that the mere existence of essential testimony by an interested witness makes a jury question.

In the Kirby Case this court specifically said: "The jury may well have arrived at the conclusion that there were sufficient suspicious circumstances connected with the transfer of the note to put the plaintiff upon inquiry, and we are of the opinion that the jury were fully justified in finding that he was not a purchaser in good faith."

In the McGill Case, this court said: "It is true that the evidence of the plaintiff was not directly contradicted, but there were circumstances disclosed by it from which the jury might have drawn the inference that he was connected with Collins in the perpetration of the fraud, or had sufficient notice of the fraud to estop him from claiming to be a bona fide purchaser for value."

And in the Union National Bank Case, the court said: "It will be observed, therefore, in the case at bar that, under the decisions of this court following the decisions of the Court of Appeals of New York, the question as to whether or not the plaintiff was a

purchaser of the notes in question, in good faith, was one for the jury, and that the jury, notwithstanding the declaration of the cashier of the plaintiff bank that he purchased without notice, paid a fair consideration for the notes, and that he acted in good faith, still the jury had the right to consider all the circumstances connected with the transaction and determine for itself whether or not the plaintiff did purchase the paper in good faith, and their verdict upon that question, in view of all the circumstances of the case, under the instruction of the court to which no exception was taken, will not be reversed by this court."

It is to be noticed, also, that these decisions were prior to the adoption of the Uniform Negotiable Instruments Law in this state (July 1, 1913), and at that time it was the law of this state that a party, in order to sustain the burden of proving due course holding as now defined in section 1756, Rev. Code 1919 (section 52, N. I. L.), must also go further and show that at the time of acquiring the paper he used all the "means an ordinarily prudent person would use to inform himself as to the manner in which the note was obtained from the maker." In other words, a duty of inquiry rested upon the holder, and he had the burden of proving the fact that he made such inquiry as an ordinarily prudent person would have made under the circumstances, and he had to sustain this fact issue, as well as those he now has to sustain, in order to establish due course holding. Of course, as the fact issues multiply, it is naturally less and less likely that only one reasonable conclusion can be arrived at as to the entire mass of fact issues. But since the adoption of the Negotiable Instruments Law in this state, and the construction of section 1760, Rev. Code 1919 (section 56, N. I. L.) by this court in Oschenreiter v. Block (1919) 42 S. D. 154, 173 N. W. 736, no such duty of inquiry rests upon a person acquiring a negotiable instrument, and that is not one of the elements that a holder in due course is obliged to prove.

Where the facts and circumstances warranted it in a particular case this court seems never to have hesitated to approve the direction of a verdict for a plaintiff having the burden of proof, even though the evidence was in whole or in part from interested witnesses. In Oschenreiter v. Block (1919) 42 S. D. 154, 173 N. W. 736, this court squarely held that the trial court should have directed a verdict for plaintiff. In Orient State Bank v. Zemlicka

(1926) 49 S. D. 277, 207 N. W. 69, we held that the court erred in denying plaintiff's motion for directed verdict and remanded the cause with instructions to enter judgment in favor of plaintiff. In McGraw Co. v. Bauer (1926) 49 S. D. 249, 207 N. W. 66, we clearly conceded the propriety of direction of verdict in a proper case.

Upon principle, therefore, and upon the authorities, and upon the previous practice of this court, we are satisfied that we erred in the former opinion in adopting, either expressly or by implication, the doctrine of the Massachusetts court that testimony of an interested witness always and of necessity makes a jury question, and we are satisfied that the better view, as well as the one according with the previous practice of this court, is that the rule of reasonable judgment must be applied to each case upon its particular facts, and, if the testimony in behalf of the party having the burden of proof is clear and full, not extraordinary or incredible in the light of general experience, and not contradicted, either directly or indirectly, by other witnesses or by circumstances disclosed, and is so plain and complete that disbelief therein could not arise by rational processes applied to the evidence, but would be whimsical or arbitrary, then, and in such case, it is not only permissible, but highly proper, to direct a verdict, and the direction of such verdict should not be prevented merely by reason of the fact that one or more of the witnesses are interested in the transaction or the result of the suit.

Respondent bank, in its application for rehearing, maintains that in the former opinion we stated some matters of fact more adversely to respondent than the evidence justifies, and in this we incline to think respondent is correct. However, inasmuch as the case must in any event be reversed because of error in failing to permit complete cross-examination of the witness Shaw, it would be pointless for us now to undertake to review the facts in detail, or to correct or modify our former statement of the facts, or to endeavor to determine the result of applying to this case and the facts herein the sounder and more liberal rule regarding direction of verdict which we have above announced. It is not likely that the testimony on a new trial, with fuller cross-examination of the witness Shaw, will be identical with the present testimony. We have, therefore, made no attempt to apply to the actual facts now

presented by the record in this case the rule as to direction of verdict above set forth. And we do not desire anything in this opinion to be taken as intimating any view, one way or the other, as to what would or should be the result of applying such rule to the facts of this case.

■ Another matter in our former opinion that requires attention at this time is the holding there set out with reference to the $5,000 certificate of deposit. In the former opinion we stated that "the record shows that the certificate of deposit for $5,000 issued as part payment for the notes remained in the hands of the Midland Packing Company for more than six months after it was issued," which, of course, would be until after the maturity thereof. In this statement we were in error. There is no evidence in the record as to when Midland Packing Company, the payee of the certificate, disposed of it, nor is there any evidence as to the circumstances of such disposition. The record shows that the certificate was dated August 6, 1919, payable February 6, 1920, and that it was paid February 12, 1920, being received from and paid to the Mechanics' Savings Bank of Des Moines. On the reverse of the certificate are the indorsements of Midland Packing Company and of three banks, two of the bank indorsements being dated, one February 9, 1920, and one February 10, 1920; but there is no date upon the indorsement of Midland Packing Company, and nothing in the record to show when or under what circumstances it, as payee, negotiated the certificate.

We held in the former opinion that by virtue of the provisions of section 1758, R. C. 1919 (section 54, N. I. L.), reading as follows: "Where the transferee receives notice of any infirmity in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be *deemed a holder in due course* only to the extent of the amount theretofore paid by him"—it was the law that, "if Shaw, the president of the bank, learned of the fraud in the inception of the appellant's notes before this certificate was actually paid, or before the bank became bound to pay it by its transfer to a holder in due course, then the bank became subject to the provisions of section 1758, above quoted, and to the rule laid down in Union National Bank v. Mailloux, 27 S. D. 543, 132 N. W. 168, that a bank discounting a note and merely crediting the payee with the

proceeds thereof is not a purchaser for value unless it shows that the amount credited to the payee was withdrawn by him prior to the bank receiving any notice of facts invalidating the notes."

Also in the former opinion we used the following language: "With the record showing that this $5,000 was not actually paid until after February 12, 1920, and the bank president failing to show that his knowledge of the payee's fraud in similar transactions was not acquired until after the certificate was actually paid, it was error on the part of the learned trial court to direct a verdict allowing the respondent to withhold the full amount of the notes and interest from appellant's funds in its hands"—by which we held in substance that the burden was on respondent bank to establish affirmatively that it had no knowledge of the fraud in the inception of the note until after the certificate of deposit was actually paid.

In our holding upon these two points in the former opinion, we now think we were in error, and that by so holding we overlooked a very important distinction, and confused two questions which are in fact entirely distinct: First, the question of whether or not the holder of a negotiable instrument is a holder thereof "for value"; and, second, the question of whether or not supervening equities may have arisen sufficient to prevent a holder who was and is admittedly a holder "for value" from enjoying certain of the privileges usually appertaining to that sort of holding; in other words, prevent him from being *"deemed"* a holder in due coure. Under the Negotiable Instruments Law, at least, whatever may have been the situation previously, it would seem that the two questions are entirely separate and distinct, and the burden of proof with reference thereto rests upon different parties. By section 1763, R. C. 1919 (section 59, N. I. L.), defect in the title therein specified having been made to appear, the burden is on the holder to prove that he *"acquired the title* as a holder in due course." One of the elements of due course holding, as specified by section 1756, R. C. 1919 (section 52, N. I. L.), is that the instrument was taken "for value." Value within the meaning of our Negotiable Instruments Law is defined in section 1729, R. C. 1919 (section 25, N. I. L.) in the following words: "Value is any consideration sufficient to support a simple contract. An antecedent or pre-existing debt constitutes value and is deemed such, whether the instrument is payable on demand or at a future time."

When the holder of a negotiable instrument, fraudulent in its inception, has established, together with the other elements of holding in due course specified in section 1756, R. C. 1919 (section 52, N. I. L.), that he gave for the instrument a "consideration sufficient to support a simple contract," he has certainly established that he took the instrument "for value" within the meaning of subdivision 3, § 1756, R. C. 1919, and he has met the burden of proving that he *acquired the title* as a holder in due course" specified in section 1763, R. C. 1919. The question of whether or not value is given is not a fluctuating matter wavering to and fro between value given and no value given, but is a simple, positive, and definite fact, and when it is once established beyond dispute in any given case it is disposed of for the purposes of that case.

Some confusion has arisen in the cases by sometimes overlooking the fact that in a suit upon a negotiable instrument by the holder against the maker the fact that the holder acquired the instrument as a due course holder does not dispose of all the rights or equities between the parties to the action. Due course acquisition and holding cuts off only those rights or equities with reference to the instrument which the maker may have had against prior parties of which the holder has no knowledge, and which, but for the due course element of the holding, the maker might likewise assert against the holder. Due course holding has nothing whatever to do with direct rights or equities between the holder and the maker, and subsequent equities may arise directly between the holder and maker, which render it impossible for the holder to enforce payment of all or part of the note, entirely regardless of the fact that he acquired it in due course, and in this connection that is all that is meant by the statement in section 1758, R. C. 1919 (section 54, N. I. L.), that the holder under the circumstances there stated "will be deemed a holder in due course only to the extent of the amount theretofore paid by him."

Section 1758, R. C. 1919, imports into the Law of Negotiable Instruments the general, equitable, remedial principle of constructive trust. The fraudulent payee of the note by his own fraud became constructive trustee of the note for the maker, and when the fraudulent payee wrongfully and in breach of such constructive trust negotiated the note, he became in turn constructive trustee for such maker of everything that he received for the note. When the

holder of the note learns of the fraud in its inception, he is that moment chargeable with knowledge of the existence of that constructive trust. His actual status as a due course holder is not in any manner affected by such knowledge. If he was a due course holder before receiving that knowledge, he continues to be a due course holder after receiving it; but from the moment that he learns of the existence of such constructive trust he must refrain from knowingly participating in a further breach thereof, and if he fails so to refrain, and the maker of the note can establish that fact, the maker will have a defense by reason of such subsequent equity, entirely regardless of acquisition in due course, to the extent of such failure to refrain. If part of the consideration given by the holder to the fraudulent payee was a valid and binding promise to pay money and such promise has not been fully performed when the holder learns of the original fraud, he must not proceed further with the performance of it; that is, he must not knowingly make further payments to the fraudulent payee, or parties in privity with him, not by reason of the fact that the promise to pay money is any less a valuable consideration than it was before, not because, having previously been a due course holder, he magically ceased to be a due course holder by receiving such knowledge, but because, if he does so, he knowingly participates in a breach of constructive trust, and regardless of the fact that he is and has been a due course holder of the instrument in actuality ever since he acquired it, and still is, yet as an equitable matter, to the extent of his knowing participation in the breach of constructive trust, he will not be *deemed* a holder in due course."

Applying these principles to the instant case, it cannot, we think, be questioned but that respondent bank, when it gave for the notes in question on August 6, 1919, its draft and its negotiable certificate of deposit for $5,000, due in six months, gave value therefor. See State Bank of Fillmore v. Hayes, 16 S. D. 365, 92 N. W. 1068; Note, 7 A. L. R. 1569; Ranchman's Trust Co. v. Gill (1923) 113 Kan. 261, 214 P. 413. And at that moment the status of the bank was definitely and irrevocably fixed as a holder for value. Certainly no one could question but that this draft and certificate were "consideration sufficient to support a simple contract," as defined by section 1729, R. C. 1919 (section 25, N. I. L.). If thereafter, and before payment of the certificate of deposit, the

bank received notice of the fraud in the inception of the note, no change arose by the receipt of such notice in the bank draft and the certificate of deposit. They were still just as much consideration for the note as they were before, and the bank was still just as much holder of the note for value as it was before; but the bank thereby learned that its outstanding certificate of deposit, if the same was still held by Midland Packing Company, was constructively held in trust for Jerke.

The bank was not thereby under any duty to go out and get in the certificate of deposit (Reitherman v. Wheeler [Mo. App. 1923] 247 S. W. 222), even had such a procedure been possible. Its only duty was to refrain from a knowing participation in a further breach of the constructive trust; that is, not knowingly to pay the money upon said certificate of deposit to the Midland Packing Company, or to any one who was not a holder thereof in due course, so as to cut off the equities of Jerke against the Midland Packing Company as his constructive trustee of the certificate. If, after knowledge of the original fraud, the bank paid the certificate of deposit to Midland Packing Company, or paid the same to some other holder thereof, knowing that such holder was not a due course holder, then to that extent section 1758, R. C. 1919, would apply, and because of such knowing breach of constructive trust, the bank would not be "*deemed* a due course holder" as against Jerke, regardless of the fact that it actually was a due course holder. But the burden of proving the existence of this supervening equity, arising out of the breach of constructive trust after becoming a due course holder, was upon the maker of the note. The burden placed upon the holder by section 1763 is limited to showing the *acquisition of title in due course*. That section does not place upon the holder any burden of going further, and negativing the existence of supervening equities, which may have arisen upon subsequent facts in favor of the maker. If any such supervening equities exist, it is for the maker of the note to prove the same by the preponderance of the evidence.

In conclusion, we think the case must be reversed, because of undue restriction of cross-examination of the witness Shaw; but we think that we erred in our former opinion in purporting to adopt, by inference, at least, the rule of the Massachusetts court that testimony of an interested witness always and necessarily

makes a jury question. We erred in some of our statements as to the fàcts, and we erred in our holding with reference to the effect of notice of fraud in the inception of the note before payment of the certificate of deposit, and with reference to the burden of proof in relation to that particular matter, and any language in the former opinion, inconsistent with the views indicated in this opinion on those points, is withdrawn, and the case is reversed and remanded for a new trial.

SHERWOOD, P. J., and BURCH and BROWN, JJ., concur.

POLLEY, J., concurs in the reversal of the judgment appealed from.