KENT FEEDS, INC., Respondent v. STAHL et al., Appellants

(238 N.W.2d 483)

(File No. 11465. Opinion filed January 15, 1976)

24

**Woods, Fuller, Shultz & Smith** and **John E. Simko,** Sioux Falls, **Richard Spilde,** Freeman, for plaintiff and respondent.

**Brady, Kabeiseman, Light & Reade** and **C. E. Light,** Yankton, for defendants and appellants.

WOLLMAN, Justice.

Plaintiff brought an action against defendants for the balance allegedly due on a series of delivery receipt notes that defendants had signed in consideration for delivery of feed supplement. Defendants alleged in their answer that the notes were not collectible because of failure of consideration; defendants also counterclaimed for damages resulting from an alleged breach of warranty. The trial court directed a verdict in favor of plaintiff on its complaint at the close of defendants' evidence, and the trial proceeded with defendants' counterclaim as the only remaining issue. The jury returned a verdict in favor of plaintiff and against defendants on the counterclaim. We reverse in part and affirm in part.

Defendants have been engaged in a general farm partnership since 1961. Their partnership farmsteads are located approximately three miles west and one mile south of Freeman, South

Dakota. Defendants' diversified farming operation consists of cultivation of corn, alfalfa, hay and oats, which defendants feed to livestock. In 1970, defendants utilized three separate feedlots in their cattle feeding operation, which will be referred to herein as lots 1, 2 and 3, respectively.

Defendants began purchasing the cattle involved in this lawsuit from various auction barns in the area in the latter part of August 1970, and completed the purchases in early November of that year. The cattle purchased were of two basic types, mixed or crossbred beef cattle, and Holsteins.

As the cattle were introduced into the several feedlots, they were started on a ration of hay and commercial protein supplement. Defendants first used a dry supplement, A & D Primer, and then switched to another dry supplement, 32% Pro X L, both of which were manufactured by plaintiff. These two supplements were fed in all three lots until defendants had the opportunity to purchase a quantity of dry supplement of comparable content at a lower price from another manufacturer.

In the fall of 1970, Morris Kaufman, an employee of plaintiff who operated a livestock feed business in Freeman under the name of Kaufman Milling Service, attempted to interest defendants in purchasing a liquid feed supplement manufactured by plaintiff called Bovin-O-Lac 440. Kaufman had sold plaintiff's feed products since 1958. He had known the defendants since the 1940's and they had been customers of his since 1968. He was familiar with their feeding operation, the number of cattle they were feeding, and the type and quality of feed they were using. He had often traveled to defendants' farmstead and had visited with and advised them from time to time about their feeding program. It was he who had sold defendants the dry feed supplement they began using in the fall of 1970. Defendants had no knowledge of the claimed advantages of the liquid supplement until Kaufman and plaintiff's district manager discussed the matter with them.

On October 15, 1970, Kaufman, plaintiff's district manager and another representative of plaintiff met with defendants at their farm for the purpose of promoting the sale of the liquid sup-

plement. Kaufman told defendants that the Bovin-O-Lac had marbling factors and health factors that the dry supplement did not have and that it was also more economical to purchase per pound and that it had gain rates equivalent to dry supplement in the tests that had been run. Kaufman testified that he recalled that defendants were told that the Bovin-O-Lac would do a better job for them as compared to the feed supplement that they were using.

Defendant Jacob Stahl recalled that Kaufman and plaintiff's district manager had told him that according to tests performed by plaintiff the Bovin-O-Lac was going to help his cattle gain as fast or faster than the dry supplement, that it was going to cost no more than the dry supplement that he was then using, that it had certain health factors that possibly even the dry supplement did not have, that the cattle would yield better when sold, that the Bovin-O-Lac contained a marbling characteristic that would improve the grade of the cattle, and that the Bovin-O-Lac would reduce the cost per pound of gain compared to the dry supplement that defendants were then using.

Based upon the enthusiasm of Kaufman and plaintiff's district manager and on the strength of their representations concerning Bovin-O-Lac 440, defendants decided to switch from the dry supplement they were feeding to plaintiff's liquid supplement. They decided to feed the liquid supplement in lots 1 and 2 and to continue feeding a dry supplement in lot 3 for the purposes of comparison. Accordingly, after the supply of the dry supplement purchased from the competitor manufacturer was exhausted, defendants switched back to plaintiff's dry supplement Pro X L in lot 3.

The first shipment of Bovin-O-Lac 440 was delivered on or about December 5, 1970, and was stored in a special holding tank owned by Kaufman Milling. The holding tank contained a mechanism for agitating the liquid supplement, inasmuch as it was necessary to agitate the supplement prior to removing it from the tank so that a homogenized mixture would be fed to the livestock.

As manufactured at plaintiff's Muscatine, Iowa, plant, the Bovin-O-Lac 440 contained the fundamental acids, phosphates, urea and salt; the other additives, including vitamins, trace minerals, drugs and regular molasses had to be added at plaintiff's Sioux City, Iowa, plant. After being completely formulated, the Bovin-O-Lac 440 was transported from the Sioux City plant to the on-farm holding tanks in a truck owned by plaintiff. The truck was loaded and unloaded by hoses, but the holding compartments on the truck did not contain an agitation system.

Each delivery of Bovin-O-Lac 440 was accompanied by a tag which guaranteed the shipment to include a certain amount of protein, vitamins and minerals, including calcium, vitamin A and zinc.

In addition to the above described vitamins and minerals, defendants also ordered the additive diethylstilbestrol (stilbestrol) to be added to each delivery of Bovin-O-Lac 440. The supplement was formulated to insure a balanced diet for cattle on feed; one of plaintiff's witnesses testified that the presence of calcium, vitamin A and the trace mineral zinc in necessary quantities improved the gainability of cattle on feed and that if the vitamins and minerals were not present in balanced quantities the rate of gain would tend to be reduced. Defendant Jacob Stahl testified that he expected the stilbestrol to account for a fifteen to seventeen percent reduction in the cost of gain. One of plaintiff's witnesses testified that stilbestrol has the reputation for significantly increasing the rate of gain in cattle and that in the absence of this additive cattle would not gain as rapidly. Another of plaintiff's witnesses testified that the use of stilbestrol should result in an increase of from fifteen to seventeen percent in feed efficiency, i.e., the ability of cattle to convert feed into meat.

Toward the middle of February 1971, having fed the liquid supplement for approximately 45 to 50 days, defendants became dissatisfied with the appearance of the cattle in lots 1 and 2 because they did not appear to show the finish or the gain that the cattle in lot 3 were showing. Defendants made their dissatisfaction known to Mr. Kaufman, who requested that defendants continue to use the liquid supplement. Because of repeated

complaints by defendants, Mr. Kaufman called in other of plaintiff's employees to attempt to assist him in determining what was wrong with the cattle. On or about April 2, 1971, Mr. Kaufman, plaintiff's district manager and another of plaintiff's employees went to defendants' feedlots, where they observed that the cattle in lot 3 showed more finish than those in lots 1 and 2. One of plaintiff's employees took samples of the silage, the corn and the liquid supplement that defendants were feeding and advised defendants that the samples would be taken to plaintiff's Muscatine plant for analysis. Mr. Kaufman had earlier asked a local veterinarian to check the cattle for disease. Mr. Kaufman himself could not observe any signs of disease and never received a report of any disease from the veterinarian. Mr. Kaufman advised defendants to switch back to plaintiff's Super A & D Primer dry supplement, which they did on or about April 4, 1971.

On or about April 10, 1971, an inspector for the South Dakota Department of Agriculture came to defendants' feedlots at defendants' request and took two samples of the Bovin-O-Lac 440 from the holding tank after one of the defendants had agitated the liquid supplement within the tank by using the electrically powered agitating mechanism. Both samples were delivered to the state chemical laboratory in Vermillion, South Dakota, for analysis. One of these samples was analyzed for total crude protein, vitamin A and diethylstilbestrol; the other sample was analyzed for total crude protein, diethylstilbestrol, vitamin A, calcium, phosphorous, salt and zinc. The results of the analysis on the two samples when compared with the guaranteed analysis tags furnished by plaintiff with the delivery of each shipment of the liquid supplement were as follows:

| Substance | Found in Samples | Stated on guaranteed analysis tag |
|---|---|---|
| Total crude protein | 46.10% (Sample 1)<br>44.99% (Sample 2) | 44.0%<br>44.0% |
| Diethylstil-bestrol | None | None |
| Vitamin A | 29,400 USP U/lb. | 34,000 USP U/lb. |

| Calcium | None | Not less than 0.1% not more than 1.0% |
|---|---|---|
| Phosphorous | 2.15% | Not less than 1.3% |
| Salt | 4.10% | Not less than 3.0% not more than 4.0% |
| Zinc | 0.01% | Not less than 0.10% (1000 ppm) |

Between the first shipment of liquid supplement on January 13, 1971 (the holding tank had been emptied prior to that date so that the agitation mechanism could be modified), and the last delivery on March 4, 1971, the holding tank was never completely empty. As each successive delivery of the liquid supplement was made, it was mixed with the liquid supplement remaining in the tank. Defendants received the last delivery of Bovin-O-Lac on March 4, 1971, and executed the last delivery receipt note on April 5, 1971.

The average gain of the 385 cattle fed out in lots 1 and 2 was 448 pounds; the average cost per pound of gain was 29.43 cents. The average gain of the cattle fed out in lot 3 was 509 pounds; the average cost per pound of gain was 17.81 cents.

Plaintiff's complaint prayed for judgment in the amount of $6,158.88 for feed sold and delivered to defendants, including the Bovin-O-Lac 440. As indicated above, the trial court granted a directed verdict for plaintiff on this claim, less certain credits to defendants.

Defendants contend that the trial court erred in interpreting our decision in Ralston Purina Co. v. Jungers, 86 S.D. 583, 199 N.W.2d 600, as requiring a verdict to be directed for plaintiff on its claim for the amount owing for the feed supplement. We conclude that defendants' contention is well taken. Failure of consideration is one of those defenses that must be set forth affirmatively in a responsive pleading. SDCL 15-6-8(c). As an affirmative defense, it is separate and distinct from a claim for damages properly set forth in a counterclaim. As was stated by this court in the case of Laney v. Ingalls, 5 S.D. 183, 58 N.W. 572:

"* * * As between the original parties, or those who stand in their place, it would be repulsive to our practice, and inconsistent with a fair, economic, and speedy administration of justice, to hold that a person sued on a promissory note given for the purchase price of personal property could not defend on the ground that there was a failure of consideration or a breach of warranty as to the quality of such property, which, if proved, would partially or entirely defeat plaintiff's recovery. * * * " 5 S.D. at 186, 58 N.W. at 572.

■ Want or lack of consideration and failure of consideration are separate and distinct defenses. One goes to the root of or reason for the alleged contract; the other is based upon events occurring after the alleged contract has been executed. 17 Am. Jur.2d, Contracts, § 397; 17 C.J.S. Contracts § 129. Indeed, in the Ralston Purina Co. case we recognized this distinction by first holding that defendants had not sustained their burden of proving total lack of consideration and by then citing United States v. Schaeffer, 9 Cir., 319 F.2d 907, for the proposition that a partial failure of consideration is ground for abatement of damages.

■ When viewed in the light most favorable to their position, defendants' evidence regarding the alleged lack of conformity between the liquid supplement and that they had ordered and that which in fact they received was sufficient to warrant submitting their defense of partial failure of consideration to the jury, although the trial court cannot be faulted for ruling as it did in view of the fact that in the Ralston Purina Co. case we did not elaborate on the distinction between the defenses of lack of consideration and failure of consideration.*

Defendants contend that the jury's verdict against them on the counterclaim was contrary to the greater weight of evidence

---

* We do not mean to imply by our holding herein that every trivial or fancied disparity between that which is agreed upon as the consideration for a contract and that which is allegedly received will support the affirmative defense of failure of consideration. It will still be the duty of the trial court in every case to determine whether the evidence in support of the claimed defense is sufficient to present an issue of fact for the jury. Cf. Jerke v. Delmont State Bank, 54 S.D. 446, 223 N.W. 585.

and was the result of mistake, passion or prejudice.

With respect to the counterclaim, the jury was instructed in part that:

"You are instructed that this Court has directed a verdict in favor of the Plaintiff for the amount claimed to be due for feed supplements sold, delivered, and used by the Defendants, less certain credits. This removes from your consideration this part of the case, and you are no longer to concern yourselves with this phase of the case.

"There remains, then, for your consideration, the counter-claim of the Defendants. Defendants in their counter-claim claim that the feed supplement, Bovin-o-lac 440, sold by the Plaintiff to Defendants, did not provide the nutritional balance guaranteed by the Plaintiff. Defendants contend that Plaintiff, through its agents, assured them that by using Bovin-o-lac 440, a liquid feed supplement, instead of the dry feed supplement they had been using, that the cost of a pound of gain would be reduced and that the cattle would yield and grade better. Defendants allege that the Bovin-o-lac 440 sold to them was defective and deficient; that the cattle fed Bovin-o-lac 440 actually gained slower than those on dry feed and at a higher cost per pound of gain; and that all of said acts constituted a breach of warranty by the Plaintiff resulting in a loss to Defendants in the sum of $10,150.20. * * * "

Instruction No. 9 informed the jury that:

"The Defendants have the burden of proving, by a preponderance of the evidence, that there were in fact warranties made with respect to the contents of the feed supplement Bovin-O-lac 440 together with the promise of greater gain at less cost per pound; that the warranty was in fact broken, and that the breach of said warranty was the poximate cause of the loss and

damages claimed by the Defendants.

"If you find from all of the evidence that Defendants have met their burden of proof as just stated, then you should return a verdict in favor of the Defendants for any loss as has been proven by the evidence. If, on the other hand, you find that the Defendants have failed to meet their burden of proof on any of the issues concerning which the burden of proof rested on them, then you should return a verdict in favor of the Plaintiff."

■Defendants argue that by instructing the jury that it had directed a verdict in favor of plaintiff for the amount claimed to be due for the feed supplement, the trial court in effect told the jury that the plaintiff was right and that the defendants were wrong, with the result that the jury mistakenly concluded that defendants were not entitled to prevail on their counterclaim. However, we note that the trial court's Instruction No. 17 informed the jury that:

"If, in accordance with the Court's instructions, you should find that the Defendants, Stahl Brothers, are entitled to a verdict against the Plaintiff, Kent Feeds, Inc., then it is your duty to award Defendants such damages as will reasonably compensate them for the loss resulting in the ordinary course of events from the breach of warranty, if such breach of warranty is found by you to be the proximate cause of such damage or loss. In arriving at the amount of loss or damage, you must not consider in any way the amount due the Plaintiff for the feed supplements sold to the Defendants. You must concern yourselves only with the damages, if any, sustained by the Defendants under their breach of warranty claim. Whatever adjustments between the parties that may be necessitated by your verdict will be made by the Court after your verdict has been received."

Although defendants contend that the jury could not be expected to intentionally reduce plaintiff's recovery by awarding damages on their counterclaim after being informed by the trial

court that plaintiff was entitled to fully recover on the promissory notes, they also argue that if their affirmative defense of partial failure of consideration had been submitted to the jury it would have been possible for the jury to determine that the Bovin-O-Lac 440 was worthless, or worth very little, and still find that defendants were not entitled to recover on their counterclaim. We think that it is just as realistic to expect that a jury would follow the court's explicit instructions and decide the merits of defendants' counterclaim without any reference to the fact that plaintiff had been granted a directed verdict on its claim for the balance due on the supplement as it would be to expect the jury to find for defendants on their affirmative defense of partial failure of consideration and against them on their counterclaim for damages for breach of warranty.

■ From the evidence presented, the jury could very well have concluded that defendants' attempted comparison of rates of gain between the cattle in lots 1 and 2 and those in lot 3 was invalid because of a number of factors, e.g., differences in type of shelter available for each pen, different types of feeding facilities for each pen, different mud conditions for each pen, different sources of silage for the cattle in the different pens, the fact that the weights of the cattle were unknown when the liquid supplement feeding program was started and when it was ended, the different genetic backgrounds of the cattle in the several pens, and the fact that the liquid supplement was fed for less than one-half the time of the total feeding period, that is, for 99 days out of a total of 223 feeding days.

Accordingly, that portion of the judgment entered on the jury verdict against defendants on their counterclaim is affirmed; that portion of the judgment based upon the directed verdict in favor of plaintiff against defendants on plaintiff's complaint for the balance due on the delivery receipt notes is reversed.

DUNN, C. J., and WINANS and DOYLE, JJ., concur.

COLER, J., concurs in part and dissents in part.

COLER, Justice (concurring in part, dissenting in part).

I would affirm both the jury verdict and the directed verdict.

As I view the defendants' answer and counterclaim they allege total failure of consideration, claiming the feed supplement was of "no value to Defendants." They claimed less than total failure of consideration, however, in their prayer for relief for the "sum of $23,699.40 less a reasonable sum for the value, if any, of the * * * supplement."

The trial court submitted to the jury as a part of damages for breach of warranty the defendants' requested jury Instruction #9 as jury Instruction #16 reading as follows:

"16

"The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty. *In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the value of the feed supplement at the time of delivery to the buyers and the value it would have had if it had answered the warranty.* However, where special circumstances are proven showing proximate damages of a greater amount, all damages which naturally may result from a breach of warranty, accrue in favor of the party injured by such breach of warranty if they are certain and determinate in nature or amount are also directly attributable to the breach of the warranty as their cause." (emphasis supplied)

By this instruction, the defendants salvaged their claim for damages for lack of quality even if the trial court erred in denying the partial failure of consideration claim.

I submit that under the foregoing instruction, coupled with Instruction #17 set forth in the majority opinion, the issue of value of the feed supplement has already been submitted to the jury, under another heading than we might prefer, and resolved

against the defendants. It became the law of the case and defen-
dants are bound by the law they helped establish for the purposes
of this case. SDCL 15-6-51(b).