FIRST STATE BANK, et al, Appellants, v. GUNDERSON, Respondent.

(223 N. W. 596.)

(File No. 6118.   Opinion filed February 8, 1929.)

*Lyon, Bradford & Grigsby,* of Sioux Falls, for Appellants.
*Payne, Olson & Barton,* of Vermillion, for Respondent.

MISER, C. ■ On August 21, 1923, respondent Gunderson executed and delivered his promissory note for $5,000 to the order of the Commercial & Savings Bank of Sioux Falls. Before its maturity on February 21, 1924, this note was, for value, sold, indorsed, and delivered by the payee bank to the First State Bank of Sioux Falls, which bank, on default of payment of said note, brought suit thereon on April 28, 1924. The First State Bank thereafter suspended business, and the superintendent of banks became party plaintiff. The note in suit will be hereinafter referred to as note A. It was given in renewal of a note of respondent Gunderson to the Commercial & Savings Bank, dated February 23, 1923, hereinafter referred to as note B. Note B was given in renewal of note C, dated August 22, 1922, but in all other respects the same as note B. Note C was purchased for full value by the First State Bank on September 19, 1922. When note C came due, the First State Bank received from the Commercial & Savings Bank note B and the accrued interest on note C; and, when note B matured, a like transaction was had, the First State Bank receiving the accrued interest on note B and having indorsed and delivered to it note A. The First State Bank had its city deposit account with the Commercial & Savings Bank, and, having a large reserve at the time, bought paper, paying full value therefor, but with the understanding that, should the reserve of the First State Bank get low, the Commercial & Savings Bank would buy back any paper sold by it to the First State Bank.

Note C was itself a renewal note, the original of which was executed and delivered by respondent, Gunderson, as follows: On June 19, 1919, respondent purchased 50 shares of the capital stock of the Commercial & Savings Bank at $200 per share, giving his notes for the purchase price. Two notes were for $3,750 each, payable to the order of Edgar G. Wenzlaff, and due March 10, 1920. One of these notes for $3,750 was indorsed and delivered to the Bon Homme County Bank of Scotland, and the other to the Tripp State Bank of Tripp. Both were thereafter purchased by the Commercial & Savings Bank at face value and accrued interest, the one in December, 1919, and the other in January, 1920. Thereafter there were repeated renewals and some partial payments, note C

being a renewal of part of said indebtedness. The execution and delivery of all the above notes by respondent, Gunderson, is not questioned.

The defense interposed by respondent to the cause of action of the First State Bank on note A is that his notes of June 19, 1919, were procured from him by fraud and misrepresentation. According to the testimony of respondent, on June 19, 1919, the cashier of a bank at Meckling introduced to respondent one Shaw, stating that Shaw represented the Commercial & Savings Bank. Shaw then told respondent that Edgar Wenzlaff was the president of the Commercial & Savings Bank, and that he (Shaw) was selling stock for the bank; that the stock was worth more than $200, but they were selling it for that amount; that the bank was growing very rapidly; that another bank at Sioux Falls had merged with it; that they had paid 20 per cent dividend the year before, and guaranteed to pay that much in 1919; that the bank had strong assets; that, if Gunderson wished to sell his stock later, Shaw would sell it for $300. Respondent thereupon subscribed for 50 shares, and received two stock certificates, of 25 shares each. These stock certificates were sent to him in an envelope from the Commercial & Savings Bank. The letter inclosing same was signed by Edgar Wenzlaff, president of the bank. Without any further foundation, respondent was asked to state the value of the stock on June 19, 1919, and, over the objection of appellant, he testified that it was worth not over $100 a share. On cross-examination, he said that he based his estimate entirely on the fact that he had received no dividends on the stock; further, that he did not know the bank's assets, liabilities, deposits, surplus, or "book value" of its stock as of June 19, 1919. Two of Gunderson's neighbors, who also bought stock about the same time, without other qualifying foundation, testified, over the objection of appellant, that on June 19, 1919, the stock was worth $100 per share or less.

Being recalled for further cross-examination, respondent, Gunderson, testified that, in October, 1919, he attended a meeting of the stockholders at Mitchell, called by the superintendent of banks; that both the superintendent of banks and the Attorney General addressed the meeting; that he understood from the superintendent of banks that the officers of the bank had sold the stock for more than it was worth, and had misrepresented the stock; that respondent

was then appointed and acted as one of a committee of stockholders to investigate the bank; that the committee met, called in McEwen, one of the officers of the bank, and went over with him the question of the sale of the stock for more than it was worth, and tried to find out what had been done with the money. The committee took an adjournment to Sioux Falls, and met there two weeks later. Respondent also participated in this committee meeting. The committee checked over with McEwen and Wenzlaff, to whom respondent's original notes were made, their action in regard to the sale of this stock, and required them to resign from the bank.

Respondent stated, however, that he did not know the reason why the committee required Wenzlaff and the other officer to resign. In response to the question: "Then you knew at that time they had defrauded you in the purchase of that stock?" respondent answered: "I know they had tried to. I understood they was to turn back some money they tried to defraud us of. I knew they had gotten away with the money for the time being." Respondent further admitted, on cross-examination, that he had received a dividend check of $300 on his stock on December 20, 1919; that he had cashed the same; that thereafter he renewed his notes in 1920 and 1921.

Respondent testified that he received a letter from the cashier of the Commercial & Savings Bank, in which it was stated that, at a regular meeting of the stockholders on January 11, 1921, a proposed reduction of the capital from $500,000 to $200,000 was discussed; that the capital of $500,000 was so large as to make it almost impossible to earn a proper dividend; that, upon taking over the bank, the management at the time of said letter found a large amount of slow and doubtful paper, and that the bank had filed a claim for $143,000 against a bankrupt; that there was a large amount of unpaid notes given by stockholders; that the state banking department and the Federal Reserve banking department had suggested to the bank that they either charge off doubtful assets and assess the stockholders, or charge off the doubtful and slow assets and reduce the capital stock. The letter closed with the suggestion that the capitalization be reduced from $500,000 to $200,000, and that the stockholders attend a meeting for that purpose. The witness also testified that the capital stock was thereafter reduced; that he received 20 shares in lieu of his 50 shares; that he did not

know, at the time of the reduction in capitalization, that the stock was not worth all he paid for it; that he knew at that time the bank had charged off $350,000 of worthless assets, but that he did not consider it a loss to him; that he was a member of a committee of stockholders organized in January, 1922, to select the board of directors; that he received a dividend check of $120, dated January 20, 1922, which was indorsed on his note, and a further dividend check of $120, dated December 30, 1922, which was indorsed on his note; that he renewed his notes in 1922 and 1923 and gave the note in suit. When respondent was recalled in rebuttal, he stated that the superintendent of banks said, at the Mitchell meeting, that Wenzlaff and McEwen were trying to get away with money that did not belong to them, the money that was received from stock subscriptions; that that was about all that he stated.

Respondent had been given the right to open and close by reason of his admission of the execution and endorsement of the note in suit; so that, at the close of respondent's case, appellant moved for a directed verdict, and renewed that motion at the conclusion of all the evidence. This motion was based on the ground, among others, that, at the time respondent executed the note sued on, he had full notice and knowledge of every fact alleged as fraud in the inception of the paper; that, after acquiring such knowledge, respondent took an active part in the proceedings of the bank, and, before making the note in suit, had been informed by the superintendent of banks that his stock was not worth what he paid for it, and had every opportunity to acquire full knowledge in regard to the stock. This motion was overruled. Over the objection of appellant, the case was submitted to the jury on four special interrogatories. The jury answered in the negative an interrogatory asking whether respondent renewed his notes after he knew that he had been imposed upon or defrauded in subscribing for the stock.

It will be observed, from the foregoing summary of that portion of the testimony of respondent relating to fraud and the waiver thereof, that the only misrepresentation which he attempts to prove is that as to the value of the stock on June 19, 1919. From the foregoing summary of such evidence, there has been omitted, and is now stated, for the purpose of especial emphasis, questions and answers from respondent's direct examination: "Q. Now, Mr.

Gunderson, when did you discover what the fact was as to the value of this stock on June 19, 1919? A. It was in January, 1924, the present year, after the bank closed." Thereupon respondent testified, over the objection hereinbefore noted by appellant, that the value of the stock on June 19, 1919, was not over $100 per share.

Certainly respondent, by his answer to the above question, did not intend to convey the idea that he did not know until in January, 1924, that the stock was worth less than $200 a share on June 19, 1919. In October, 1919, before the first renewal, he was told by the superintendent of banks that the stock had been sold for more than it was worth. True, on rebuttal, he says that about all the superintendent of banks said was that Wenzlaff and McEwen were trying to get away with money from stock subscriptions that did not belong to them; but the committee of which he was a member took up with McEwen the sale of stock *for more than it was worth*. It required Wenzlaff, to whom respondent's original notes were given, to resign. He says he knew at that time that they had tried to defraud him in the sale of the stock. All this took place before the first of at least five renewals, which culminated in the giving of the note in suit. Between January 11, 1921, and July 1, 1921, he was advised by the cashier of the bank, and introduced in evidence the letter advising him, that the capital was so large as to make it almost impossible to earn a proper dividend, and the bank was confronted with the alternative of reducing the capital or assessing the stockholders.

On cross-examination, respondent had testified that he based his estimate on the value of the stock on June 19, 1919, entirely on the fact that he had received no dividends on the stock. Although not approving that standard of valuation, we may assume that respondent, as he says, used no other. If so, the fact that he received no dividend in 1920, after receiving one for $300 in 1919, and the letter advising that it was almost impossible to earn a proper dividend, would not be without effect on one who used that criterion. Furthermore, he knew, in 1921, that $350,000 of worthless assets had been charged off, all this by the testimony of respondent himself.

If, by respondent's answer to the question as to when he discovered "what the fact was as to the value of this stock on June

19, 1919," he intended to convey the idea that it was not until the bank had closed in 1924 that he knew that his stock was worth not more than $100 per share on June 19, 1919, his subsequent testimony is not inconsistent therewith. But when, if ever, respondent discovered that the stock *was worth not over $100 per share* on June 19, 1919, is of no importance. His waiver, if there was a waiver, is not affected by that fact. When was it that he first knew that it was worth less than $200 at the time of its purchase? When did he discover the only fraud which he attempts to prove? To say from the respondent's entire evidence that respondent did not know, until after the bank failed in 1924, that his stock had been sold to him for more than it was worth, is to accept as true that which he himself contradicts by his own testimony and his own acts. This assumes, though we do not decide, that respondent had proven by competent evidence Shaw's agency, and that the value of the stock, on June 19, 1919, was less than $200 per share. In the view we take of the case, it is unnecessary to decide whether these matters were proven by competent evidence.

But it may be argued that the jury, by its special verdict, determined that appellant did not know, until after he gave the renewal note in suit on August 21, 1923, that he had been defrauded when he executed the original note in 1919. It is true that the jury, without having defined to it the word "defrauded," did find that respondent did not "renew the original note or notes of which the note sued upon is a renewal, after he knew that he had been imposed upon or defrauded in subscribing for the stock." But could the jury have found that respondent had proven by the preponderance of the evidence that he did not know until after August 21, 1923, that he had paid for his stock on June 19, 1919, more than it was worth? It did not so find, and, from the record, it could not have so found, except by rejecting a greater part of respondent's own testimony than it accepted as true.

But appellant assigns as error the overruling of a motion for a directed verdict at the close of respondent's case. When this motion was made, the trial judge was charged with the performance of a duty. This duty was defined by the Supreme Court of the United States in Schuykill & D. Improvement & R. Co. v. Munson, 14 Wall. 442, 20 L. Ed. 867, which was quoted with approval by this court in Peet v. Dakota Fire & Marine Ins. Co., 1 S. D. 462,

467, 47 N. W. 532, 533, as follows: "In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof rests."

While the opinion of this court in Drew v. Lawrence was by a divided court, the majority opinion contains the following: "Upon a motion to direct a verdict the question is whether there is any 'evidence upon which the jury could, without acting unreasonably in the eye of the law, decide in favor of * * * the party producing it.'" 37 S. D. 620, 624, 159 N. W. 274, 275. In the minority opinion, the above rule is stated in almost identical language. 37 S. D. 629, 159 N. W. 277. In the opinion on rehearing of Jerke v. Delmont State Bank (S. D.) 223 N. W. 585, decided at this term, Judge Campbell states the rule thus: "If the proof offered by the party having the burden in support of the existence of ultimate issuable facts is so meager that a reasonable mind could not therefrom arrive at the existence of such ultimate fact, there is nothing for the jury, and the judge not only may but should direct a verdict against the party having the burden of proof."

When the foregoing test is applied to the testimony of respondent, it is clear that it would be unreasonable to say that respondent was a mere passive holder of stock certificates, which certificates, however, he made no offer to return until after this suit was brought. In October, 1919, he went from his home in Clay county to Mitchell to attend a stockholders' meeting. Whatever the superintendent of banks said, respondent understood that the officers of the bank had "sold the stock for more than it was worth." He served on a committee which took up with McEwen "the sale of the stock for more than it was worth," and required Wenzlaff, the payee of respondent's original notes, to resign. He was a member of a committee of stockholders organized in January, 1922, to select a board of directors. He renewed his note the first time after being told that the stock had been sold for more than it was worth, and at a time when he knew "they had tried to defraud him." He repeatedly renewed it, with ever-increasing opportunities for knowledge.

On the foreging state of the evidence, it was incumbent on the trial judge, on appellant's motion for a directed verdict, to

apply the law relating to waiver of the defense of fraud. This may be stated thus: If respondent, at the time of executing the renewal note sued on, had knowledge of the alleged fraud practiced upon him in inducing him to give such original notes, he could not now urge such fraud as a defense to the note sued upon. Muschelwicz v. Tidrick, 40 S. D. 435, 443, 167 N. W. 499, 501. See note 35 A. L. R. 1280, and cases cited; Daniel, Neg. Inst. (6th Ed.) § 205, p. 302; Joyce, Defenses to Commercial Paper (2d Ed.) § 224; and note, 41 A. L. R. 963, and cases cited; 3 R. C. L. 1106, § 321, Bills & Notes; 8 C. J. 444.

Applying this rule to the facts as established, the defense of fraud interposed by respondent failed of proof, and, in our opinion, the motion of appellant for a directed verdict should have been granted. This view of the case makes unnecessary the decision of other questions raised by the appeal. Among these is the question of the negotiability of the note. A like note was held negotiable in Security National Bank of Sioux City v. Gunderson, 52 S. D. 25, 216 N. W. 595.

The judgment is reversed, and the cause remanded, with directions to enter judgment as prayed for in appellants' complaint.

SHERWOOD, P. J., and POLLEY, CAMPBELL, and BURCH, JJ., concur.

BROWN, J., not sitting.